118 P.3d 54

In the Interest of Jane DOE, Born on November 22, 2002, a Minor (No. 26721; FC–S No. 02–08654).

In the Interest of Jane Doe, Born on November 22, 1998, a Minor (No. 26722; FC–S No. 02–08475).

Nos. 26721, 26722.

Supreme Court of Hawai'i.

Aug. 10, 2005.

Jeffry R. Buchli, Kapolei, on the briefs, for Mother–Appellant.

Deirdre Marie–Iha and Dorothy D. Sellers, Deputy Attorneys General, State of Hawai'i, on the briefs, for Department of Human Services–Appellee.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by ACOBA, J.

Mother–Appellant (Mother)[1] appeals from the May 4, 2004 order of the family court of the first circuit (the court) awarding permanent custody in favor of the Department of Human Services–Appellee (DHS) and the June 29, 2004 orders denying Mother's May 21, 2004 motion for reconsideration. We hold the orders must be vacated and the matters herein remanded because (1) the court abused its discretion in reappointing the guardian ad litem without a hearing pursuant to Hawai'i Revised Statutes (HRS) § 587–34(d) (1993) and (2) Mother was deprived of her parental rights without a fair hearing.

### I.

The facts as set forth by the parties follow. On or about August 6, 2002, DHS received a report alleging physical neglect, threatened neglect, and lack of supervision of Jane Doe, born on November 22, 1998 (Jane 1), by Mother. Jane 1 and her Mother had been residing at the Institute of Human Services since August 1, 2002. Based on its investigation, DHS believed there existed an imminent threat of physical neglect to Jane 1 and lack of supervision of Jane 1 by Mother.

On August 26, 2002, Jane 1 was taken into police protective custody, released to DHS, and placed in a DHS foster home. Upon placement, Jane 1 appeared to be in good health. Jane 1 did not appear to be afraid of Mother. DHS filed a Petition for Temporary Foster Custody of Jane 1 on August 29, 2002. The court accepted jurisdiction over Jane 1

on September 3, 2002, pursuant to HRS §§ 571–11(9)[2] and 587–11[3] (1993).

Mother did not appear at the initial hearing on September 3, 2002, was defaulted, and a bench warrant was issued for her arrest.[4] All parties were ordered to appear at a review/return on Motion for Permanent Custody hearing on November 1, 2002. Mother did not appear at the review hearing.[5] The court continued foster custody. All parties were ordered to appear at a review hearing on February 21, 2003.

### II.

On November 20, 2002, DHS filed a Motion for Order Awarding Permanent Custody and Establishing a Permanent Plan (Motion for Permanent Custody) for Jane 1. The hearing on the Motion for Permanent Custody was set for February 21, 2003, at the same time as the review hearing.

On November 22, 2002, Mother gave birth to a baby girl (Jane 2). On November 25, 2002, Jane 2 was taken into police protective custody, released to DHS, and placed in a DHS foster home. On November 29, 2002, a Petition for Temporary Foster Custody of Jane 2 was filed.

On December 3, 2002, a hearing on temporary foster custody of Jane 2 was held.[6] Mother was present and was served in open court with the petition and exhibits. Mother agreed to jurisdiction, foster custody, and the service plan dated November 27, 2002. The court took jurisdiction, ordered foster custody and the service plan dated November 27,

1. For purposes of preserving confidentiality, Mother–Appellant is referred to as "Mother," and the subject children, born on November 22, 1998 and November 22, 2002, are referred to as "Jane 1" and "Jane 2," respectively.

2. HRS § 571–11(9) states that "the [family] court shall have exclusive original jurisdiction in proceedings ... [f]or the protection of any child under chapter 587."

3. HRS § 587–11 states as follows:
 Pursuant to [section] 571–11(9), the [family] court shall have exclusive original jurisdiction in a child protective proceeding concerning any child who was or is found within the State at the time the facts and circumstances occurred, are discovered, or are reported to the

[Department of Human Services], which facts and circumstances constitute the basis for the finding that the child is a child whose physical or psychological health or welfare is subject to imminent harm, has been harmed, or is subject to threatened harm by the acts or omissions of the child's family.

4. The Honorable John C. Bryant, Jr. presided.

5. The Honorable Marilyn Carlsmith presided at the hearings on November 1, 2002, January 24, February 21, June 13, September 30, and December 30, 2003, and January 22, May 4, and June 29, 2004.

6. The Honorable Paul T. Murakami presided.

2002. All parties were ordered to appear at a review hearing on February 21, 2003.

On January 17, 2003, Mother filed a Motion for Immediate Review to discuss why Mother's visitation with Jane 2 had been stopped.

On January 22, 2003, a "full psychological evaluation" of Mother was conducted by clinical psychologist Dr. Steven Choy (Dr. Choy) of the Kapiolani Child Protection Center.

On January 24, 2003, a hearing was held on Mother's Motion for Immediate Review. The court ordered that Mother would have visits with Jane 2 twice a week. Mother's motion was withdrawn.

On February 21, 2003, a review hearing was held. The case for Jane 1 was set for a contested permanent custody trial on July 21, 2003. A pretrial hearing was set for June 13, 2003. A review hearing for the case of Jane 2 was also set for June 13, 2003.

On May 28, 2003, DHS filed a Motion to Continue Trial for the purpose of ordering a service plan in Jane 1's case. The hearing on the motion was set for June 13, 2003.

On May 29, 2003, DHS filed a Motion for Order Awarding Permanent Custody and Establishing a Permanent Plan (Motion for Permanent Custody) for Jane 2. The hearing on the Motion for Permanent Custody for Jane 2 was set for June 13, 2003, at the same time as the hearing on the Motion to Continue Trial in Jane 1's case.

### III.

On June 13, 2003, a hearing was held on the Motion to Continue Trial in Jane 1's case and the Motion for Permanent Custody in Jane 2's case. The deputy attorney general (DAG) representing the DHS raised "the issue of whether Mother needs a guardian [ad litem]." Mother's counsel made an oral motion to withdraw as counsel. The court denied the motion. The court ordered that a guardian ad litem be appointed, over Mother's counsel's objection. The court consolidated the two cases for trial and set aside the

trial scheduled for July 21, 2003 in Jane 1's case. The trial was set for October 16, 2003. A pretrial hearing was set for October 3, 2003.

On August 1, 2003, Mother filed a Motion for Immediate Review to discuss visitation and placement of the children. A hearing on the motion was set for August 8, 2003.

On August 6, 2003, the Order Appointing Guardian ad Litem for Mother effective August 4, 2003, was filed. On August 8, 2003, a hearing was held on Mother's Motion for Immediate Review.[7] The court denied without prejudice Mother's request or demand for visitation with Jane 1 pending the trial. The court partially granted Mother's motion as to visitation with Jane 2 "and condition[ed] any supervised visits as recommended by DHS, [the guardian ad litem,] and Dr. [Gregory] Yuen [ (Dr. Yuen) ]." On September 16, 2003, Mother filed a Motion for Immediate Review to discuss visitation with the children. The motion was set for September 30, 2003.

On September 30, 2003, a hearing was held on Mother's Motion for Immediate Review. By agreement, the pretrial hearing set for October 3, 2003 was advanced to September 30, 2003. Mother's Motion for Immediate Review was denied.

### IV.

On October 16, 2003, a contested Permanent Plan hearing was to be held.[8] Mother's counsel made an oral motion to withdraw as counsel. Mother stated that counsel could serve as her attorney for that day. The court denied Mother's counsel's oral motion to withdraw.

On October 16, 2003, the court also ordered DHS to clarify whether Mother needed a guardian ad litem "by obtain[ing] a report from Mother's psychiatrist" or "arrang[ing] a psychological evaluation of Mother" "on the issue of whether Mother needs a [guardian ad litem, *i.e.*] whether she has the capacity to understand the proceedings and to meaningfully assist her counsel." The court indicated that "[i]f a [guardian ad li-

---

7. The Honorable Lillian Ramirez–Uy presided over the hearings on August 8 and December 16, 2003

8. The Honorable Michael Broderick presided.

tem] is necessary for Mother, [the guardian's] appointment shall continue; Mother's counsel shall consult with Mother's [guardian ad litem] and take direction from Mother's [guardian ad litem]; the [c]ourt will give further clarifications." Lastly, the court continued the trial to December 30, 2003.

On December 16, 2003, a pretrial hearing was held. The DAG reported to the court that "the previous court has actually prematurely appointed a guardian ad litem for Mother." The DAG further reported to the court that clinical psychologist Dr. Choy completed an evaluation and assessment of Mother and determined that she did not need a guardian ad litem. Mother's guardian ad litem requested to be excused in light of Dr. Choy's determination that Mother did not need a guardian ad litem. Mother's counsel informed the court that at every hearing Mother believes her children are going to be returned to her that day. Mother's counsel advised the court that he was not sure if Mother could adequately assist him in trial. The parties "stipulate[d] to [Dr. Choy's] verbal report to DHS that Mother does not need a [guardian ad litem]" and the guardian ad litem was discharged.

However, on December 18, 2003, Mother purportedly appeared at the courthouse, demanded to see a judge to get her children back, and refused to leave for several hours.[9] Thereafter, on December 19, 2003, apparently without notice or a hearing, the court reappointed the guardian ad litem. Also, on December 19, 2003, an Order Substituting Counsel for Mother effective December 18, 2003, was filed.

On December 30, 2003, a contested Permanent Plan hearing was to be held. Mother did not appear. The court defaulted Mother and granted the Motion for Permanent Custody. Following the entry of default, Mother's substitute counsel requested a continu-

ance because of Mother's history of coming to hearings but sometimes being late. The court denied the motion for a continuance.

Additionally, on December 30, 2003, the court received into evidence Dr. Choy's written report dated October 28, 2003. This report concluded that Mother "is able to understand the court proceedings and the service plan" and that "[s]he, therefore, does not need a guardian ad litem to make decisions for her." The report stated in relevant part as follows:

*REASON FOR ASSESSMENT*

[Mother] was referred for a psychological assessment to determine her current mental status in order to assess her ability to understand the court proceeding and the service plan. *The family court is concerned about [Mother's] functioning and the need for a guardian ad litem for her. A full psychological evaluation was completed on 01–22–2003*, when she was given a possible diagnosis of Schizophrenia, Paranoid Type; Depression, NOS, and Mild Mental Retardation. Her psychiatric care has been inconsistent and there are concerns about her ability to care for her special needs children.

. . . .

*FORMULATION*

[Mother] was referred for a psychological assessment primarily to determine the need for a guardian ad litem and to determine her current mental status. Although she has had a long history of substance abuse and suspected mental illness, she currently did not have any acute symptoms of a psychosis. This does not mean that she doesn't have any mental illness as the psychotic symptoms could be under control with medication and/or she may be in remission. She, however, is not acutely psychotic at this time and *she is able to understand the court proceedings and the*

---

**9.** Mother's conduct on December 18, 2003 is only described in (1) finding number 29 as rendered by the court, *see* text *infra* at 14, and (2) the guardian ad litem's Special Report to the Court filed January 21, 2004. The Special Report described Mother's actions as follows:

Around 12/19/03 Court Officer S. Holden informed this [guardian ad litem] that she was being reappointed for [M]other, who had

shown up at Family Court on/about 12/18/03 around 11 a.m. and had refused to leave the courthouse until she was allowed to see a judge. [Mother] remained waiting, until 3:30 p.m., and then left.

Aside from this, no testimony or affidavits from eyewitnesses concerning Mother's behavior appears in the record on appeal.

*service plan. She, therefore, does not need a guardian ad litem to make decisions for her. ...*

....

### RECOMMENDATION

1. [Mother] will need to be consistently followed by a psychiatrist that will provide consistent feedback to DHS in order to ensure that she is obtaining the necessary treatment.

....

3. *[Mother] does not need a guardian ad litem* but the service plan needs to be written in a very simple and concrete manner for her to understand the ramifications of her decisions.

(Emphases added.)

Based on this report and Dr. Choy's finding that Mother could make decisions and did not need a guardian ad litem, the guardian ad litem placed an objection on the record to being reappointed as Mother's guardian ad litem. The court noted at this hearing that Dr. Choy's report "does not reflect him observing [Mother] in a very highly emotionally charged situation, which it was when [Mother] was here that day[.]" The court also stated that Mother "was here for a very long time [on December 18, 2003], making a really difficult situation for the court officer and some of the bailiffs.... And, so, that swayed the court to make that unusual reappointment."

### V.

On January 2, 2004, Mother filed a Motion for Immediate Review to set aside Mother's default and schedule a permanent custody trial on the merits and a Motion for Reconsideration of the granting of the Motions for Permanent Custody and approving the foster family and children's relocation from the State of Hawai'i.

On January 22, 2004, a hearing was held on Mother's Motion for Immediate Review and Mother's Motion for Reconsideration. Mother's substitute counsel objected to the receipt of Mother's guardian ad litem's first report. The report was received into evidence over objection. The court granted the motions. Trial was set for June 3, 2004.

Mother's guardian ad litem orally moved to withdraw. Mother's substitute counsel advised the court that if Mother's guardian ad litem is taken off the case, he "would have to pursue withdrawal at that point." The court denied the guardian ad litem's motion to withdraw.

### VI.

On May 4, 2004, a pretrial hearing was held. Prior to the hearing there was a prehearing conference conducted without Mother. Mother's guardian ad litem disclosed to the court that Mother had bought plane tickets. Mother's counsel objected to Mother's guardian ad litem disclosing privileged and confidential information. The court noted the objection and permitted Mother's guardian ad litem to proceed. Mother's counsel requested a running objection, which the court granted.

Mother's guardian ad litem advised the court that she had a statement by Dr. Yuen, Mother's treating psychiatrist, and that she did not agree with Dr. Yuen's statement. After reading the letter the court stated, "Let the record reflect that I am looking at the letter from [Dr. Yuen] dated April 29th ... which indicates stability if she is medicated." Mother's guardian ad litem disclosed to the court that Mother "had confided to me that she doesn't need medication and, therefore, is acting accordingly."

Mother's counsel advised the court that should Mother's guardian ad litem "leave this case, I would have no other alternative but to proceed on my client's wishes." Mother's counsel stated, "[O]bviously my client wants a trial; but [Mother's guardian ad litem] will control whether there will be a trial, and I guess that's where we're—we're factored in."

After the prehearing conference, Mother was brought into the courtroom. Mother asked if she could have custody of her children because she was asking for leave to go back to California. Mother informed the court that she had plane tickets. Mother complained of discrimination by her counsel and her guardian ad litem.

Following a pause in proceedings during which Mother's counsel and her guardian ad litem conferred, Mother's guardian ad litem advised the court, *"I believe at this point it is in [Mother's] best interest to have the Motion for Permanent Custody granted,* Your Honor, with all the ramifications flowing therefrom, so that [Mother] can get on with her life." (Emphasis added.) Mother's counsel agreed with the recommendation stating in relevant part that

[the guardian ad litem] and I have labored on the subject of the proceeding, the strategies, the plans.... *While there is the ability to litigate this matter, Your Honor, as [the guardian ad litem] has made a recommendation,* as well as the recommendation of the DHS, the children's [guardian ad litem], *I am of the strong belief that Mother's [guardian ad litem] is speaking on the best interest of Mother, and I have to follow that ... recommendation* [.]

(Emphases added.) Mother stated that she was "able to provide a safe home" for her children and "begg[ed]" the court to allow her to "have a chance with them."[10] The court, however, found "that Mother cannot now nor in the reasonably foreseeable future, even with the Service Plan, provide a safe family home." Mother stated, "I can't move. My leg hurts, I can't move; I can't move." An ambulance was called.

The court reconvened in another courtroom. Mother's guardian ad litem waived Mother's presence. The court granted the Motion for Permanent Custody, found that the Permanent Plan dated May 19, 2003 was in the best interest of the children, and ordered said Permanent Plan. The court discharged Mother's guardian ad litem and her counsel. The court ordered that appellate counsel be appointed for Mother.

The court noted that Mother strongly objected to the granting of the Motion for Permanent Custody. The court set aside the June 3, 2004 trial date. Mother's counsel advised the court that "we were prepared to fully go to trial except that the developments

that led up to today, and even beyond today—I mean, prior to today, and we had no choice, Your Honor."

## VII.

On May 21, 2004, Mother's Motion for Reconsideration was filed. On June 24, 2004, Mother's counsel's Motion to Withdraw as Counsel was filed. On June 29, 2004, a hearing was held on Mother's motions. The Motion to Withdraw was granted. Following a recess, substitute counsel argued the Motion for Reconsideration. The Motion for Reconsideration was denied. On June 30, 2004, an Order Substituting Counsel for Mother effective June 29, 2004 was filed.

On July 26, 2004, Mother's Notice of Appeal was filed. On September 1, 2004, Findings of Fact and Conclusions of Law were filed. As related to the appointment of the guardian ad litem, the court entered the following relevant findings:

5. The court first appointed ... Mother's [guardian ad litem] ... effective August 4, 2003. At the hearing on December 16, 2003 ..., the court granted [the guardian ad litem's] oral motion to withdraw as Mother's [guardian ad litem]. *On December 19, 2003, the court reappointed ... Mother's [guardian ad litem].*

....

25. At the consolidated hearing in both cases on June 13, 2003, the court denied the oral motion of Mother's counsel, Tae Chin Kim, to withdraw as Mother's counsel. *The court, over Mr. Kim's objection, ordered that a [guardian ad litem] be appointed for Mother.* Mother's [guardian ad litem] was appointed effective August 4, 2003.

26. At the October 16, 2003 scheduled consolidated trial on DHS' "Motion for Permanent Custody" in both cases, the court denied Mr. Kim's oral motion to withdraw as Mother's counsel (at the request of Mother). The court further ordered DHS to obtain a report from Mother's treating psychiatrist to determine

---

**10.** Mother stated, "I'm able to provide a safe home for my kids. Please, could I have a chance

with them? ... I'm begging you please."

whether Mother needed a [guardian ad litem], i.e., whether Mother had the capacity to understand the proceedings and to meaningfully assist her counsel, and that if Mother's psychiatrist was not available to obtain an opinion from Mother's psychiatrist, then DHS was to arrange a psychological evaluation on this issue. The court further ordered that if the opinion of Mother's psychiatrist or the psychologist conducting the psychological evaluation was that Mother did not need a [guardian ad litem], and then Mother's [guardian ad litem] would be discharged.

27. *At the December 16, 2003 pretrial in both cases, the court granted Mother's [guardian ad litem's] oral motion to withdraw as Mother's [guardian ad litem], based on the oral report from Dr. Steven J. Choy, Ph.D. (as related by DHS) that opined that Mother had the capacity to understand the proceedings and had the ability to assist her counsel, and therefore did not need a [guardian ad litem].* The court also denied Mr. Kim's oral motion to withdraw as Mother's counsel but ruled that Mother may make an oral motion to proceed pro se at trial.

28. The court discharged Mr. Kim as Mother's counsel in both cases and appointed Byron K.H. Hu as Mother's counsel in both cases, effective December 18, 2003.

29. *On December [1]9, 2003, Dr. Choy's report notwithstanding, the court reappointed . . . Mother's [guardian ad litem] after learning that on December 18, 2003, [M]other came to the Family Court waiting room around 10:30 a.m.; demanded to see a judge to get her children back; would not take no for an answer; did not respond to a court officer's repeated explanations, and finally left the courthouse around 3:30 p.m.*

. . . .

33. A consolidated pretrial in both cases was held on *May 4, 2004. In the proceedings, Mother was observed to throw herself on the floor and lay immobile when told she could not get her children back,* as a trial on permanent custody in both cases had been set for June 2004. Mother's [guardian ad litem], who had consistently requested a trial on the merits regarding the State's Motion for Permanent Custody in both children's cases, stated on the record that *she no longer felt it was in [M]other's best interests to attend these numerous court appearances or to go to trial.*

. . .

At the pretrial, therefore, Mother's [guardian ad litem] stated on the record that it was in Mother's best interests that DHS's "Motion for Permanent Custody" in both cases be granted, and that Mother was not willing and able to provide a safe family home for the Children, even with the assistance of a service plan, now and in [sic] reasonably foreseeable future. . . . The representation of Mother's [guardian ad litem] was a stipulation to DHS' "Motion for Permanent Custody" in both cases. *Mother and her counsel objected to the position of Mother's [guardian ad litem].*

34. *Based on the representation of Mother's [guardian ad litem], and the court's independent review of the record in both cases, the court, in both cases, . . . issued orders* granting DHS' "Motion for Permanent Custody," *terminating the parental rights of Mother* and the respective fathers of the Children, awarding permanent custody of the Children to DHS, and establishing the respective permanent plans regarding the Children.

. . . .

### [Guardian ad litem] for Mother

106. The court *appointed a [guardian ad litem] for Mother at the June 13, 2003 hearing due to the court's concerns about* the effects of Mother's mental health on *her ability to understand the legal significance of the issues and the nature of these child protective proceedings and her ability to assist her counsel (disagreements with her counsel due her mental health and her inability to understand the nature of the proceedings).* The court observed her erratic behavior in the courtroom, which, in part, was the basis for the court's decision.

107. The *court reviewed the October 28, 2003 Psychological Assessment of Mother by Dr. Choy, which Dr. Choy opined that Mother understood the proceedings and did not need a [guardian ad litem].*

108. However, Mother's behavior after Dr. Choy's Psychological Assessment was inconsistent with Mother's reported behavior during Dr. Choy's Psychological Assessment. *Mother had appeared at the family court, and behaving erratically, refused to leave the family court unless she spoke to a judge, despite being informed by her counsel and the family court staff that she could not see a judge. Based on Mother's behavior, the court reappointed Mother's [guardian ad litem], on the basis that Mother did not have the capacity to understand the legal significance* of the issues and the nature of these child protective proceedings and to meaningfully assist her counsel.

(Emphases added.) The court entered the following pertinent conclusions:

2. The court may appoint a [guardian ad litem] for a party (parent) when the court determines that a party is incapable of comprehending the legal significance of the issues or the nature of the child protective proceedings. HRS § 587–734(c) [sic].

3. If a [guardian ad litem] has been appointed for a parent, the parent's counsel should look to the parent's [guardian ad litem] for decisions on behalf of the client. Hawaii Rules of Professional Conduct, Rule 1.14, comment 3.

4. Mother's [guardian ad litem] had authority to stipulate to DHS' "Motion for Permanent Custody."

5. ... *Lalakea v. Laupahoehoe S[ugar] Co.,* 35 Haw. 262, 283–[ ]85 (1939), rehearing denied, 35 Haw. 349 (1940)[,] ... [is] not ... applicable.... The Hawaii Supreme Court ... [did] not [rule] that a [guardian ad litem] for a party cannot enter into an [sic] stipulation waiving the rights of the party, as stated by Mother's counsel. *See Leslie v. .... Estate of ... Tavares,* 91 Hawai'i 394, 401–[ ]03, 984 P.2d 1220, 1227–[ ]28 (1999).

6. The court's independent review of both cases at bar constitutes a review of the stipulation of Mother's [guardian ad litem] for fairness in accordance with the above cases.

## VIII.

Mother raises numerous points on appeal. In her argument she maintains *inter alia* that (1) Mother's guardian ad litem did not have the authority to waive Mother's right to a trial on the merits and stipulate to the DHS's Motion for Permanent Custody, (2) Mother's guardian ad litem's disclosure of privileged and confidential information to the court violated the Hawai'i Rules of Professional Conduct and the guardian ad litem's fiduciary duty to Mother, (3) Mother's counsel's agreement with her guardian ad litem to waive her right to a trial on the merits and stipulate to the DHS's Motion for Permanent Custody constituted ineffective assistance of counsel, (4) the psychologist who assessed Mother for the DHS determined that Mother was able to understand the court proceedings and did not need a guardian ad litem to make decisions for her, and (5) Mother's treating psychiatrist reported that she is stable when she takes her medication and that she could provide a safe home for her children.

In response to Mother's arguments related to the guardian ad litem, DHS maintains that "[a] family court has the authority to appoint a guardian ad litem for an adult under HRS § 587–34(d) [11] ... [inasmuch as it] permits the court to appoint a [guardian ad litem] for

---

11. HRS § 587–34(d) states as follows:

When the court determines, *after such hearing as the court deems to be appropriate,* that a party is incapable of comprehending the legal significance of the issues or the nature of the child protective proceedings, *the court may appoint a guardian ad litem to represent the interests of that party;* provided that a guardian ad litem appointed pursuant to this section shall investigate and report to the court in writing at six month intervals, or as is otherwise ordered

by the court, regarding the current status of the party's disability, including, but not limited to, a recommendation as to available treatment, if any, for the disability and a recommendation concerning the manner in which the court should proceed in order to best protect the interests of the party in conjunction with the court's determination as to the best interests of the child.

(Emphases added.)

any 'party' who cannot comprehend the significance of the proceedings." [12] DHS argues further, that "[d]espite the psychologist's conclusion" "that Mother did not need a [guardian ad litem,]" "[t]he court was not obligated to consult with the psychologist, nor was the psychologist's report binding" because the psychologist had not seen Mother in the situations presented at court, and given Mother's erratic and confused behavior, the court was well within its discretion to appoint the guardian ad litem. The court entered an order pursuant to "HRS [§§ ] 571–8.5[ (a) ](8),[13] 571–24,[14] 587–34[ (d) ] or Family Court Rule 152" [15] effective August 4, 2003.

### IX.

■ First, it is noted that in its conclusions of law, the court relied on HRS § 587–34(d) as authority for appointing Mother's guardian ad litem.[16] Because that statute states that the court "may" appoint a guardian, discretion resided in the court as to whether to do so or not. *See supra* note 11. *See Gray v. Admin. Dir. of the Court*, 84 Hawai'i 138, 149, 931 P.2d 580, 591 (1997) ("[W]here the verbs 'shall' and 'may' are used in the same statute, especially where they are used in close juxtaposition, we infer that the legislature realized the difference in

12. DHS also maintains that "Mother does not separately argue that the family court should not have appointed a [guardian ad litem] for Mother." However, the issue of whether a hearing is required pursuant to HRS § 587–34(d) for the reappointment of a guardian ad litem is fairly implicated and raised by Mother's arguments on appeal that "Mother's guardian ad litem did not have the authority to waive Mother's right to a trial on the merits and stipulate to DHS's Motion for Permanent Custody" and "the psychologist that assessed Mother ... determined that *Mother was able to understand the court proceedings and did not need a guardian ad litem to make decisions for her*." (Emphasis added.)

13. HRS § 571–8.5(a)(8) (Supp.2004) states in pertinent part that "district family judges" have the power to "[a]ppoint guardians ad litem for ... persons who are incompetent[.]"

14. HRS § 571–24 (1993) states in pertinent part as follows:

> **Failure to answer summons; warrants.....** If, after being summoned or notified to appear, a parent fails to do so, a warrant may be issued for the parent's appearance, and *the*

meaning and intended that the verbs used should carry with them their ordinary meanings."). In reviewing a court's exercise of discretion it must be determined whether the court abused its discretion. *See Kawamata Farms, Inc. v. United Agri Prods.*, 86 Hawai'i 214, 241, 948 P.2d 1055, 1082 (1997) (stating that an abuse of discretion occurs when the trial court "exceeds the bounds of reason or disregards rules of principles of law or practice to the substantial detriment of a party").

■ "This court reviews the trial court's findings of fact under the clearly erroneous standard." *Bremer v. Weeks,* 104 Hawai'i 43, 51, 85 P.3d 150, 158 (2004) (citing *Beneficial Hawai'i, Inc. v. Kida,* 96 Hawai'i 289, 305, 30 P.3d 895, 911 (2001)).

"A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed. A finding of fact is also clearly erroneous when the record lacks substantial evidence to support the finding. We have defined substantial evidence as credible evidence which is of sufficient quality and probative value to enable a

> *hearing shall not take place without the presence of one or both of the parents or the guardian, or, if none is present, a guardian ad litem appointed by the court to protect the interests of the minor. The court may also appoint a guardian ad litem,* whenever this is necessary *for the welfare of the minor,* whether or not a parent or guardian is present.
>
> (Emphases added.)

15. Family Court Rule 152 (2003) entitled "Presence and Exclusion of Parties," states in pertinent part that "[i]f for some reason found valid by the court no parent can be present, the court may appoint a guardian ad litem prior to the hearing."

16. As noted previously, HRS § 571–8.5(a)(8) authorizes district family judges to "[a]ppoint guardians ad litem for ... persons who are incompetent[.]" There is no evidence that Mother is "incompetent" and DHS does not argue that she is incompetent. The relevance of HRS § 571–24 or Family Court Rule 152 is not pointed out by DHS. Rather, appointment is justified, according to DHS, under HRS § 587–34(d).

person of reasonable caution to support a conclusion."

*Id.* (quoting *Beneficial Hawai'i*, 96 Hawai'i at 305, 30 P.3d at 911) (internal citations, quotations marks, brackets, and block quotation format omitted).

## X.

 HRS § 587–34(d) requires that the court hold a "hearing as the court deems appropriate" before appointing a guardian ad litem. In related circumstances, this court has said the appointment of a guardian ad litem "presupposes a finding by the trial court that the affected party labors under a disability, making it necessary for another person to represent his or her interests in the litigation." *Leslie v. Estate of Tavares*, 91 Hawai'i 394, 400, 984 P.2d 1220, 1226 (1999). Hence, " '[t]he *purpose of appointing a guardian ad litem is to protect the person under disability*. Indeed, courts should appoint guardians ad litem for parties litigant *when reasonably convinced that a party litigant is not competent, understandingly and intelligently, to comprehend the significance of legal proceedings and the effect and relationship of such proceedings* in terms of the best interests of such party litigant.' " *Id.* (quoting *State ex rel. McMahon v. Hamilton*, 198 W.Va. 575, 482 S.E.2d 192, 200 (1996) (emphases added)). As a result, "the powers of a guardian ad litem . . . to act on behalf of a ward are strictly circumscribed by the court's own responsibility to ensure that the interests of the ward are not compromised." *Id.* at 400 n. 8, 984 P.2d at 1226 n. 8.

 This court has stated further that "the continuing incompetence of an adult party for whom a [guardian ad litem] has previously been appointed must be raised before the trial court." *Id.* at 401, 984 P.2d at 1227. " 'When a substantial question exists regarding the mental competency of a party, a court must determine whether the party is or is not competent to proceed with the action before it.' " *Id.* (quoting *McMahon*, 482 S.E.2d at 201).

## XI.

Here, a guardian ad litem was appointed for Mother on June 13, 2003. At this hearing, the court summarily determined that a guardian ad litem should be appointed:

[MOTHER'S COUNSEL]:—I would make an oral motion to withdraw as counsel and have substitute counsel for my client.

THE COURT: Okay. I'm going to deny your motion.

And you may not—you may not know, but you have one of the most experienced and best people in—in this kind of case in this court.

*I do think a guardian ad litem would be appropriate—*

THE MOTHER: *What's—excuse me, Your Honor.*

THE COURT:—*a guardian for Mother would be appropriate.*

[MOTHER'S COUNSEL]: *We're going to object—*

THE MOTHER: *What's a guardian for Mother?*

[MOTHER'S COUNSEL]:—to that, Your Honor, for the record.

THE COURT: That objection will be noted. *And I will order that a guardian be appointed for the mother.* I'm very concerned about her capacity. And, clearly, she—I mean, she's been in front of this [c]ourt how long and she's had a very experienced attorney, and she still doesn't understand why the children are—the State has taken custody of them.

THE MOTHER: *No, because—excuse me. No, no, because I do understand.* The woman called when I was in HIS (sic). They took my kids from me, and they said it was an SSI lawyer—law, and I—it wasn't. I had to (indiscernible) of the girls in the shelter. That's how my daughter— my first daughter got tooken [sic] from me. *I know how my kids got tooken [sic] from me.*

. . . .

THE MOTHER: *Excuse me—excuse me, Your Honor.*

*So when do my kids return to me?*

Because I can't have any more kids, and this is my last set, and I—I'm—I got an apartment and one bedroom, and *I can prove I'm going to be a good mother.*

THE COURT: Okay. Well, that's what—*there will be a trial on that.*

I don't think there's anything available till probably October—

What is the first date for a full-day trial?

THE MOTHER: October?

THE CLERK: October 16.

THE MOTHER: *That's a long time from now. Can't it be sooner?*

. . . .

THE MOTHER: Excuse me, I can't—I can't get a leave to another state, to my hometown?

Because I'm from New York. I want to leave, because I'm not getting no fair trial here. I'm saying—I'm not.

THE COURT: There's no law that makes you stay here. However, the children are in the jurisdiction.

THE MOTHER: Can I come back and get my kids, then?

*Why am I losing my kids to the—to the State of Hawaii when I didn't do anything?*

*That's what I'm trying to explain.*

THE COURT: *Perhaps a guardian ad litem can explain it better to you.* I think that there's—your guardian can. Because given the—you know, I don't think any explanation I make is going to do any good. Apparently any explanation your attorney made has not done any good, and he is extremely—

THE MOTHER: He didn't explain nothing to me. He—*he always tell me if I go to parenting class, I'll get my kids.* Well, I'm going to parenting classes, and I don't see I'm getting anything.

THE COURT: Okay. You know, there is no guarantee, even after somebody does all the services, that they can get their child back because—just because you go doesn't mean that you learn and can use what you go for. So the Court has to—

THE MOTHER: I can use what I—I can use—

THE COURT: Well, that's going to be the subject of the trial.

. . . .

THE COURT: 8:30, *October 3rd, at—*

THE MOTHER: *That's too far. That's too far along. Excuse me. Your Honor.*

THE COURT:—for pre-trial. And State's witnesses—

THE MOTHER: Excuse me.

. . . .

[MOTHER'S COUNSEL]: Your Honor, one other question: In regards to—*since the Court has granted the leave of the child out of the jurisdiction,* if—and—

THE MOTHER: I (indiscernible). *Excuse me, I don't want that.*

[MOTHER'S COUNSEL]:—*over the objection of Mother.*

. . . .

[DEPUTY ATTORNEY GENERAL]: It would probably be the same day as [Jane 2's], the same day, so one day a week. Because prior to this, Mother had never asked for—

. . . .

THE COURT: Okay. I'm not going to order any make-up visits. It's only for a week time. And apparently Mother hasn't requested visits prior to this time.

THE MOTHER: *Yes, I requesting now; I requesting it.*

THE COURT: Is there anything—

THE MOTHER: Because I—I get to see her twice a week, my daughter.

. . . .

THE COURT: . . . We'll see you back at those dates in October.

[DEPUTY ATTORNEY GENERAL]: Yes, Your Honor.

THE COURT: *And a guardian will be appointed for Mother.*

THE MOTHER: *What is the guardian for?*

[MOTHER'S COUNSEL]: *I'll explain it to you.*

(Emphases added.)

■ The foregoing colloquy between the court and Mother demonstrates Mother's un-

derstanding of the legal significance of the proceedings insofar as (1) she recognized that the State continued to have custody of her children; (2) she understood a trial was to be held at which she had the opportunity to "prove" she could be "a good mother"; (3) she perceived the trial was "too far" in the future inasmuch as, at that point, the court had scheduled an October 3, 2003 trial date; (4) she objected to the court allowing her child to leave this jurisdiction; and (5) she requested visits with her children following the court's statement that she had not requested visits prior to the June 13, 2003 hearing. In light of this evidence of Mother's ability "to understand the legal significance of the issues and the nature of [the] ... proceedings," the court's finding number 106, *see* text at p. 152, 118 P.3d at p. 62 *supra*, is not supported by the record on appeal.

On October 16, 2003, after the appointment of the guardian ad litem, the court ordered either a report from Mother's psychiatrist or a psychological evaluation as to whether Mother needed a guardian ad litem. On December 16, 2003, the court considered the psychologist's conclusion that Mother did not need a guardian ad litem and said guardian was dismissed. Thus, the psychologist's report and findings that Mother "is able to understand the court proceedings" and "[s]he does not need a guardian ad litem to make decisions for her" indicate Mother was competent to proceed without a guardian ad litem.

■ Mother's apparent behavior on December 18, 2003 seemingly led the court to reappoint the guardian ad litem on December 19, 2003, as explained in the court's findings numbers 29 and 108. *See* text at pp. 151–152, 118 P.3d at pp. 61–62 *supra*. Finding number 29 states that the court reappointed the guardian ad litem "after learning" about Mother's behavior of "demand[ing] to see a judge," "not tak[ing] no for an answer," "not respond[ing] to a court officer's repeated explanations," and leaving the courthouse "around 3:30 p.m." after waiting there since "around 10:30 a.m." Finding number 108 reiterates that the court reappointed the guardian based on Mother's "er-

ratic[ ]" behavior of "appear[ing] at the family court" and "refus[al] to leave ... unless she spoke to a judge, despite being informed by her counsel and the family court staff that she could not see a judge."

These findings, however, are clearly erroneous as "the record lacks substantial evidence" "of sufficient quality and probative value" "to support [such] finding[s]." *Bremer*, 104 Hawai'i at 51, 85 P.3d at 158. The court (1) did not witness Mother's behavior but "learn[ed]" of her behavior, (2) seemingly relied on hearsay by "a court officer," "[Mother's] counsel and the family court staff," and (3) evaluated Mother's conduct in the absence of testimony or affidavits from the court officer, Mother's counsel or family court staff as eyewitnesses. Indeed, in contrast to the characterizations in findings 29 and 108, the only apparent evidence in the record of Mother's behavior on December 18, 2003, is in the guardian ad litem's Special Report which states in relevant part that

[a]round 12/19/03 Court Officer S. Holden informed this [guardian ad litem] that she was being reappointed for [M]other, who had shown up at Family Court on/about 12/18/03 around 11 a.m. and had refused to leave the courthouse until she was allowed to see a judge. *[Mother] remained waiting, until 3:30 p.m., and then left.*

(Emphasis added.) The parties do not point to anything else in the record to support the court's finding of Mother's "erratic behavior" on December 18, 2003. *See* finding no. 108 at p. 152, 118 P.3d at p. 62 *supra*. In any event, the events of December 18, 2003 fail to establish Mother's inability to "comprehend the significance of the legal proceedings and the effect and relationship of such procedures," *Leslie*, 91 Hawai'i at 400, 984 P.2d at 1226, with respect to her interests. If anything, the record reflects that Mother was well aware of the significance of the proceedings and the adverse legal consequences of a motion for permanent custody to her interests as a parent.

Additionally, Mother's actions do not necessarily evidence her misunderstanding of the court proceedings. Rather, Mother's apparent December 18, 2003 request to see a judge is consistent with evidence of her June

13, 2003 expressed desire that her children be "return[ed]" to her and her frustration with the length of the proceedings that the trial date was set "too far along." *See* text at p. 156, 118 P.3d at p. 66 *supra.*

## XII.

■ As mentioned before, the "continuing incompetence of an adult party for whom a [guardian ad litem] has previously been appointed," *Leslie,* 91 Hawai'i at 401, 984 P.2d at 1227, is a matter to be determined by the trial court. No hearing was held pursuant to HRS § 587–34(d) to determine Mother's incompetence although the court reappointed a guardian ad litem on December 19, 2003. The record does not indicate any notice was given to Mother of the court's intention to reappoint a guardian ad litem. This lack of notice and failure to conduct a hearing, therefore, afforded Mother no opportunity to respond to the court's reasons for reappointment of said guardian.

In light of (1) Mother's understanding of the legal proceedings and their effect as demonstrated by her statements during the June 13, 2003 hearing; (2) Dr. Choy's report indicating that a guardian ad litem for Mother was unnecessary; (3) Dr. Yuen's treating psychiatrist's report that medication would control any problem; (4) the court's reappointment of Mother's guardian ad litem based only on Mother's purported erratic behavior on December 18, 2003; (5) the absence of "substantial evidence," *Bremer,* 104 Hawai'i at 43, 85 P.3d at 158, in the record concerning the nature of the December 18, 2003 "incident" and (6) the lack of any indication from the December 18, 2003 incident that Mother did not comprehend the significance of the proceedings, the court's decision to reappoint a guardian without conducting a hearing was contrary to evidence that Mother did understand the legal significance of the proceedings. Hence, the court abused its discretion in failing to convene a hearing pursuant to HRS § 587–34(d).

It should be observed that at the subsequent May 4, 2004 pretrial conference and hearing, at which permanent custody of Mother's children was granted to DHS and her parental rights were terminated, Mother's statements and conduct also demonstrated her understanding of the proceedings. Her statements there were consistent with Mother's belief at the June 13, 2003 hearing that a trial would afford her the opportunity to "prove" she would be "a good mother" and regain custody of her children. Mother urged that she would provide a safe family home, and in response to the guardian ad litem's, counsel's, and the court's adverse statements, "begg[ed]" the court to give her a "chance" with her children. Mother's counsel confirmed at the pretrial conference that Mother "want[ed] a trial." Mother's counsel also represented to the court on May 4, 2004, that Mother was "prepared to fully go to trial[.]"

## XIII.

■ Second, in the instant case, Mother was also "deprived" of her "parental rights" "without a fair hearing." *In re Doe Children,* 99 Hawai'i 522, 533, 57 P.3d 447, 458 (2002). This court has held as follows:

> We affirm, independent of the federal constitution, that *parents have a substantive liberty interest in the care, custody, and control of their children protected by the due process clause of article 1, section 5 of the Hawai'i Constitution. Parental rights guaranteed under the Hawai'i Constitution would mean little if parents were deprived of the custody of their children without a fair hearing.* Indeed, parents have a fundamental liberty interest in the care, custody, and management of their children and the state may not deprive a person of his or her liberty interest *without providing a fair procedure for the deprivation.* Furthermore, the Supreme Court has said that parental rights cannot be denied without an opportunity for them to be heard at a *meaningful time and in a meaningful manner.*

*Id.* (internal quotation marks, citations, and brackets omitted) (emphasis in original and some emphases added).

The court's finding number 33 that on May 4, 2004, Mother "thr[e]w herself on the floor and lay immobile when told she could not get

her children back," is incomplete and misleading because it fails to recite what had occurred before this. As stated previously, on May 4, 2004, the court conducted a pretrial conference and hearing for the trial set for June 3, 2004, initially in Mother's absence. At that time the court apparently read a letter from Mother's treating psychiatrist, Dr. Yuen, indicating Mother was stable if "medicated." Mother's guardian expressed disagreement with the letter. The guardian also informed the court that Mother had airline tickets for the children. Counsel objected to this disclosure. Mother later informed the court about the airline tickets when she was allowed into court. Counsel indicated that Mother "wants a trial" but that Mother's guardian ad litem "will control whether there will be a trial."

When Mother was present, the guardian recommended to the court that the permanent custody motion should be granted even though trial had been set for June 3, 2004. Counsel agreed with this recommendation. Although counsel indicated that "there is the ability to litigate this matter," he stated the guardian ad litem was speaking "on the best interest" of Mother and he had to follow the guardian's recommendation. The guardian ad litem's statement to the court that the motion for permanent custody should be granted and counsel's agreement to that statement was in clear contravention of Mother's stated desire for a trial and of the already scheduled trial date in June. Following counsel's agreement with the guardian's recommendation, Mother stated she could provide a safe family home, "begging" the court to give her "a chance" with her children. In response the court indicated that Mother could not provide a safe family home. Only then did Mother state she could not move and was removed by the ambulance.

After Mother's removal, the guardian waived Mother's presence, the court granted the permanent custody motion, and set aside the June 3, 2004 trial date. Following this, Mother's counsel still noted, *inter alia*, that "we were fully prepared to go to trial today and . . . prior to today."

The record does not indicate that (1) Mother had any notice that there would be no trial concerning her parental rights, (2) the guardian ad litem notified Mother that she was going to recommend that the court grant permanent custody to DHS, (3) Mother was advised by her counsel that he would join in the recommendation that the court grant DHS's motion for permanent custody, (4) Mother was advised of the effect of the guardian's recommendation by the guardian or by her counsel before the recommendation was made, (5) Mother was informed of the consequences of the guardian's waiver of Mother's presence at the pretrial hearing and that she concurred, and (6) a disposition regarding her parental rights would be rendered on that very day.

The recommendation by Mother's guardian ad litem and counsel that the court grant permanent custody to DHS and the waiver of Mother's presence led to the court's termination of Mother's parental rights. This court has said that the trial "court's own responsibility to ensure that the interests of the ward are not compromised" "strictly circumscribe" "the powers of the guardian." *Leslie*, 91 Hawai'i at 400 n. 8, 984 P.2d at 1226 n. 8. Under these circumstances the court failed to meet its responsibility. In light of these considerations, Mother was "denied" "an opportunity . . . to be heard at a meaningful time and in a meaningful manner," *In re Doe Children*, 99 Hawai'i at 533, 57 P.3d at 458, as to the termination of her parental rights. Ultimately, without a trial concerning these "substantive liberty interest[s] in the care, custody, and control of [her] children," Mother was "deprived of the custody of [her] children without a fair hearing." *Id.*

## XIV.

For the foregoing reasons, the court's December 19, 2003 order reappointing Mother's guardian ad litem is vacated and a hearing on such reappointment shall be conducted pursuant to HRS § 587–34(d). Inasmuch as Mother did not receive a fair hearing, *id.*, the court's May 4, 2004 order awarding permanent custody and its June 29, 2004 orders denying Mother's motion for reconsideration are also vacated and the case is remanded to

the court for further proceedings consistent
with this opinion.