202 P.3d 610

**John DOE, Petitioner–Appellee,**

v.

**Jane DOE, Respondent–Appellant.**

No. 28662.

Intermediate Court of Appeals of Hawai'i.

Feb. 27, 2009.

Gary Victor Dubin, on the brief, for Respondent–Appellant.

Elizabeth C. Melehan, on the brief, for Petitioner–Appellee.

Marianita Lopez, on the brief, Guardian Ad Litem.

RECKTENWALD, C.J., WATANABE and LEONARD, JJ.

Opinion of the Court by LEONARD, J.

Respondent–Appellant Jane Doe (**Mother**) appeals from a June 19, 2007 order (**Final Order**) of the Family Court of the Second Circuit (**Family Court**), which granted sole legal and sole physical custody of the parties' five-year-old child (**Child**) to Petitioner–Appellee John Doe (**Father**) and granted Father leave to relocate to the mainland with Child. Mother also challenges two interlocutory orders of the Family Court, a September 23, 2005 *ex parte* order awarding sole custody to Father (**Ex Parte Order**), and an August 17, 2006 order granting in part and denying in part Mother's motion to vacate the Ex Parte Order and two purported stipulated orders (**Order re Motion to Vacate**),[1] as well as the Family Court's findings of fact (**FOFs**) and conclusions of law (**COLs**) entered on June 19, 2007.[2]

We hold that: (1) Mother's argument that the Ex Parte Order violated her substantive liberty interests and due process rights under the Hawai'i Constitution is not moot because of the significant, unmitigated impact of the Ex Parte Order; (2) under the Hawai'i Constitution, absent express findings of exigent or emergency circumstances, due process requires that a parent be given notice and an opportunity to be heard prior to a change in primary physical or legal custody in family court custody matters; (3) the Family Court erred when it issued a blanket protective order precluding Mother from obtaining any discovery from the guardian ad litem without balancing Mother's legitimate discovery needs in the context of this case against the alleged injury or burden that might result from Mother's discovery; (4) subject to reasonable restrictions and limitations, Mother was entitled to seek discovery from a therapist whose opinions played a critical role in this case and to subpoena the therapist's testimony; (5) the Family Court did not err in excluding expert testimony that lacked foundation; (6) a party's willingness to submit to polygraph testing, as well as the results of such polygraph testing, are inadmissible as evidence in child custody proceedings; (7) in this case, polygraph results substantially contributed to the granting of the Ex Parte Order, triggered Mother's prolonged separation from Child, substantially affected the outcome of the custody proceedings, and were highly prejudicial to Mother in ways that were not adequately addressed by merely excluding those results at trial; and (8) the best interest of a child can be justly and adequately determined only in proceedings that are consistent with the requirements of the Hawai'i Constitution and applicable law. As provided herein, we vacate the Final Order and remand for further proceedings consistent with this opinion.

I. *BACKGROUND*

After a "short term," unmarried, relationship between Mother and Father, Child was born in March of 2002. Mother and Father lived together in Father's home during Moth-

---

1. The Honorable Simone C. Polak entered the Ex Parte Order and the Order re Motion to Vacate.

2. The Honorable Keith E. Tanaka entered the Final Order, as well as the FOFs and COLs.

er's pregnancy. When Child was approximately five weeks old, Father asked Mother to move out. In June of 2002, Mother and Child moved to California, where they stayed with Mother's father (**GJ**) and stepmother (**KJ**) (collectively, **the Js**) for two weeks before moving into an apartment. During the one-year period that Mother and Child lived in California, GJ provided financial assistance to Mother and the Js babysat for Child while Mother worked and went to school. As later reported by a Guardian Ad Litem (**GAL**) appointed by the Family Court, KJ also wanted to help Mother "by giving her advice on child care." Mother and the Js became estranged in or about June 2003.

Also in 2003, Father petitioned a California court regarding paternity and visitation. On June 5, 2003, with the agreement of both Mother and Father, the California court entered a Conciliation Court Agreement and Stipulated Order Re: Custody and Parenting Plan and a Child Custody Visitation Order Attachment, both of which were incorporated into and made part of a Judgment entered by the California court on June 10, 2003 (California Custody Judgment). The parties stipulated that Father was the biological father of Child, Mother and Father would hold joint legal custody of child, and, upon Mother's moving to Hawaiʻi with Child (as agreed), Mother would have the care and responsibility of Child, except during Father's time, which was every Tuesday and Thursday, from 3 p.m. to 7 p.m., and the 1st, 2nd, 3rd, and 5th weekend of the month from Saturday at 9 a.m. to 4 p.m. or Sunday 9 a.m. to 4 p.m. (alternating with each weekend visitation). Father's visitation was to be changed to every other weekend, from Saturday at 9 a.m. to Sunday at 4 p.m., upon Child becoming thirty months old or sooner, if the parents agreed that Child was ready. This parenting schedule was further modified by a holiday and vacation schedule. Beginning on June 15, 2003, Father was ordered to pay child support to Mother in the monthly amount of

$450, along with 50% of the total child care costs and 50% of the reasonable uninsured health care costs for Child. Various other issues were memorialized and/or addressed in the California Custody Judgment.

It appears that Mother and Child moved back to Maui in July 2003 and that Father already resided on Maui at that time. On March 17, 2004, Mother filed *pro se* a Registration of Child Custody Determination; Custody/Visitation Statement; Exhibit A (California Custody Judgment) in UCCJEA No. 04–1–0003 (2004 **Proceeding**) in the Family Court.[3] Although the exact timing is unclear, it is abundantly clear that a dispute arose between Mother and Father over visitation and custody of Child, which included, *inter alia,* allegations by Mother that Father had sexually abused Child.

On September 17, 2004, Father filed a petition in the 2004 Proceeding seeking sole physical and legal custody of Child (**Sole Custody Motion # 1**).[4] Father claimed that Mother was difficult to deal with, refused to make reasonable accommodations for Father's visitation, intended to interfere with his overnight visitation with Child, and falsely accused Father of molesting Child. Father argued, *inter alia:* "I am now self-employed and have great flexibility in my schedule. I am able to have our [Child] on a full-time basis with reasonable visitation to [Mother]."

Father concurrently submitted an *ex parte* motion to enforce the California Custody Judgment, noting that Child had reached the age of thirty months (days earlier), and seeking to immediately enforce his visitation rights, specifically including overnight visits. On September 21, 2004, this *ex parte* motion was filed, along with an attached order granting the *ex parte* motion, without prior notice to Mother. An acknowledgement of service dated September 28, 2004, indicates that Mother was served on September 24, 2004. Prior to Family Court's ruling on

---

3. Although the 2004 Proceeding was initiated by Mother with this filing, she is identified as the Respondent or Defendant, presumably as a reflection of her status in the California case.

4. It is undisputed that Mother and Father agreed to jurisdiction and venue in the Family Court *after* Father filed a request for a change of custody in the California court in July of 2004 and Mother sought to quash service, dismiss the petition, and transfer the case to the Family Court.

Father's *ex parte* motion, however, on September 18, 2004, Father kept Child overnight following his regular Saturday day visit. When he did not return Child to Mother's care, the police were called and Mother reportedly sought and obtained a temporary restraining order, which was later dismissed.

On September 23, 2004, Father caused subpoenas to be issued to the director of Child's preschool (for all records and correspondence pertaining to Child), the Custodian of Records for the Maui Police Department (for all records and reports pertaining to Mother and Father), and two individual police officers. Also on September 23, 2004, the Js filed a motion to intervene for the purpose of allowing them to seek visitation with Child.

On September 29, 2004, a hearing was held on Father's Sole Custody Motion # 1 and the Js' motion to intervene. Roughly ten months later, on August 3, 2005, an interim order was entered granting the Js' motion to intervene, ordering the appointment of Jacque Ford as GAL (**GAL # 1**), and confirming visitation to Father on Tuesday and Thursday afternoons, with overnight visitation subject to the GAL's inspection of Father's residence. An evidentiary hearing was set for January 3, 2005 on the Js' request for visitation and Father's Sole Custody Motion # 1.

On December 2, 2004, Father filed a motion for appointment of a new GAL, which also sought a temporary order modifying custody/visitation, an order that Mother submit to psychological evaluation, and to continue trial. A hearing was held on December 15, 2004, but no transcript was provided to this court. A written order, which was entered on August 3, 2005, stated that the parties agreed to the appointment of a new GAL and if they could not agree on a name, they would both submit names of potential appointees to the court. The order also stated that the issue of psychological evaluation was moot because evaluations had already been completed on both parties by Mark Breithaupt, Ph.D. (**Dr. Breithaupt**), and the parties agreed that the evaluations could be submitted to the court under seal.

On January 12, 2005, Father caused subpoenas to be issued to GAL # 1, Ellen Brew-erton of Child Protective Services (**Brewerton**), and Dr. Breithaupt. GAL # 1's Report was filed (under seal) on January 13, 2005, with an addendum filed on January 14, 2005. GAL # 1's report noted disturbing reports from various persons concerning the Js' past conduct, particularly with respect to GJ. GAL # 1 reported "multiple psychological allegations" by Mother and Father and her opinion that Dr. Breithaupt's recommendations "need to be followed," including Father's completion of a parenting class (which Mother had already completed). GAL # 1 recommended that Mother and Father be allowed time, with the assistance of professionals, to learn to co-parent Child, and that the Js "need to take a step back." GAL # 1 opined that "the involvement of [the Js] in this case complicates the ability of [Child's] parents to resolve their issues."

It appears that a hearing or hearings were held on January 18 and 24, 2005, but no transcripts were provided to this court. Months later, on August 3, 2005, a "Further Order on Motion for Appointment of a New GAL ..." referencing the January 24, 2005 hearing was entered, ordering, *inter alia*, that the existing custody/visitation schedule would remain in effect pending the appointment of a new GAL (with the cost of the GAL to be equally shared by Mother and Father) and that a case review and investigation would be conducted by the new GAL. On January 31, 2005, Father filed a "Proposed Order Appointing Guardian Ad Litem," which proposed that attorney Marianita Lopez (**GAL # 2 or Lopez**) be appointed as the GAL. Father requested that Lopez be appointed at an hourly rate of $200.00, that the parties be equally responsible for her fees and costs, and that Lopez not be limited in the amount of her fees. On February 7, 2005, Mother filed "Proposed Orders Appointing Guardian Ad Litem," which proposed either attorney Mitch Werth or attorney Janice Wolf be appointed as the GAL, both of whom had agreed to a cap of $5,000. However, in the interim, on February 4, 2005, Lopez was appointed as GAL # 2.

On March 1, 2005, Father caused another subpoena to be issued to GAL # 1, seeking GAL # 1's entire file, specifically including

any information or reports received from Dr. Breithaupt.

On March 16, 2005, Lopez filed an interim report, which was to make a recommendation on whether it was in Child's best interests that the Js remain as intervenors in the case. In addition to reporting on the parties' histories and statements, Lopez reported, *inter alia*, that:

> [The Js] have funded Father's litigation in California and Maui and have provided him a car for use in Maui and a well-appointed apartment in Kihei. [The Js] also provide emotional support to Father and are in continual contact with him, particularly when [Child] is with Father. This support of Father, and not her, by her own father has angered and hurt Mother.

Although Lopez did not see any ulterior motives on the part of the Js, she stated that their support of Father and their legal intervention only complicated matters and fueled the litigation. Lopez recommended that the Js voluntarily withdraw from the case. On April 15, 2005, a stipulation to dismiss the Js' motion to intervene without prejudice was signed by the parties and entered by the Family Court. The Js' financial and other support for Father apparently continued.

On May 13, 2005, Father caused subpoenas to be issued to Child Care Connection, Dr. Breithaupt, Kaiser Permanente, Children's Garden Pre–School, Susan Brown, MA, DHS/Child Welfare Services, Verizon Hawai'i, and Meredith Moon, Ph.D. (**Dr. Moon**). On May 20 and 26, 2005, Father also caused subpoenas to be issued to Cellco Partnership and Dr. William Kepler.

On May 20, 2005, Father filed an *ex parte* motion to enjoin and restrain Mother from removing Child from the island of Maui. This *ex parte* motion was supported only by a declaration of counsel, which reported statements to counsel by Father and the Js that (three-year-old) Child told them that Mother said they were moving to the mainland and Mother said they were moving to Italy. The *ex parte* motion was granted, without prior notice to Mother and without a hearing. No hearing was ever held on these allegations, which were repeated in a later (September 23, 2005) *ex parte* motion.[5] A proof of service dated May 23, 2005, indicates that Mother was served, after-the-fact, at 4:28 p.m. on May 20, 2005.

On May 27, 2005, Father filed a motion for immediate change of custody, for temporary restraining order, and other pendente lite relief, seeking *inter alia*, immediate physical custody, sole legal custody, and suspension or supervision of Mother's visits with Child (**Sole Custody Motion # 2**). This motion was served on Mother and set for hearing on June 8, 2005. On August 3, 2005, the Family Court entered an order reserving Father's requests for an immediate change in custody from Mother to Father, suspension of Mother's "visits" with Child, and court-ordered psychological counseling of Mother and granting, *inter alia*, Father's request to allow Father to engage the services of a play therapist (ordering the parties to alternate taking Child to therapy), to enjoin and restrain Mother from disseminating confidential information to third parties, and to order Mother to submit to a polygraph test to aid the GAL's investigation of the custody dispute. The order on Sole Custody Motion # 2 set a further hearing on that motion for July 28, 2005 and reset the hearing on Sole Custody Motion # 1 from July 14 and 15, 2005 to November 17 and 18, 2005.

On June 28, 2005, Father moved to compel the production of documents from Kaiser Permanente, DHS/Child Welfare Services, Child Care Connection, Dr. Breithaupt, Susan Brown, MA, and for an order to show cause why Dr. Moon and Wendy Choi, Ph.D. (**Dr. Choi**), should not produce documents pertaining to Mother (as requested in the unfiled, unserved subpoenas to Drs. Moon and Choi, which were submitted with Father's motion).

On the same day, June 28, 2005, Father initiated a new proceeding in the Family Court, UIFS No. 05–1–0033 (**2005 Proceed-**

---

5. At the custody hearing held in mid–2007, Mother denied these allegations and pointed out that neither she nor Child had passports. Perhaps ironically, Mother also noted that it was Father who later took Child out of pre-school for approximately one month to go on an extended "vacation" in California in contravention of a later Family Court order.

ing), with the filing of a "Registration of Foreign Support Order," which (again) submitted the California Custody Judgment to the Family Court. On June 29, 2005, Father filed a Motion and Affidavit for Post–Decree Relief in the 2005 Proceeding, seeking to reduce his $450 monthly child support obligation, as well as his obligation to share in child care and health care expenses (**Motion to Reduce Child Support**). Father stated that, now that he was self-employed, his income had decreased. Father's Income and Expense Statement reflected, *inter alia,* gross monthly income of $1,700, monthly housing and transportation expenses in the amount of $2,285, including a rent or mortgage payment in the amount of $1,650 (with no car payment, but with monthly car insurance, maintenance and operating expenses), plus personal expense of $1,082 for Father and Child (including child support). Father noted that he was "getting assistance from friends and family," but did not disclose the source or amount of the assistance. Father asserted that Mother was earning $2,500 per month.

In her opposition to the Motion to Reduce Child Support, Mother included a June 7, 2005 letter notifying her that she was not meeting her minimum sales quota at her time-share sales job and that she had fourteen days to meet the standard, as well as a July 1, 2005 letter confirming that she was released from her employment on June 21, 2005, and that her monthly earnings for April, May, and June of 2005 had been less than $805 per month. Mother also submitted a letter verifying that she started a new job (at a restaurant) on July 3, 2005, with an estimated gross monthly income of $1,450 per month. After various further developments in the 2004 and 2005 Proceedings, discussed below, on March 16, 2006, the Family Court entered an order on the Motion to Reduce Child Support, which ordered Mother to pay $450 monthly child support to Father.

In June and July of 2005, Father initiated another wave of discovery, issuing new sub-

poenas duces tecum and notices of subpoenas of documents in lieu of depositions upon written interrogatories to Buzz's Wharf Restaurant, Consolidated Resorts, Ma'alaea Grill, Beverly Lundquist, Leigh–Anne Leggett, William G. Kepler, M.D. (**Dr. Kepler**), Annie Reinecke (**DHS/CWS**), Brewerton, Wendy Choi, Ph.D., and Dr. Moon.

On July 28, 2005, a hearing was held on what was described (in the written order) as Father's motion for extended visitation. Although no transcript was provided, it appears that this was a further hearing on the reserved issues stemming from Sole Custody Motion # 2. The order entered on August 8, 2005, provided, *inter alia,* that Father would have visitation three consecutive nights each week, from Friday to Monday morning.[6] It appears that this order was intended to be an interim order pending the hearing on Sole Custody Motion # 1.

On September 23, 2005, Father filed an Ex Parte Motion for Immediate Change of Custody and for Temporary Restraining Order (**Father's Ex Parte Motion**). Father's Ex Parte Motion included declarations from GAL # 2 and Father. GAL # 2's Declaration referenced a number of reasons for supporting Father's Ex Parte Motion including, *inter alia,* four TRO applications by Mother in the prior year seeking orders restraining Father from contact with Mother and/or Child, Mother's purportedly "failed" polygraph tests (reported to GAL # 2 by a third party), and the GAL # 2's belief that Mother had coached Child to say "Daddy touched my foony" and otherwise sexualized Child for the purpose of terminating contact between Father and Child.

It appears from GAL # 2's Declaration that her belief that Mother was responsible for Child's sexual abuse allegations against Father was based predominantly on a report of a polygraph test given to Mother and the following sequence of events reported by the GAL: (1) on September 2, 2005, Mother provided Brewerton with a number of video-

---

6. The August 8, 2005 order also provided for "monitoring" of the "parties' access," presumably the parties' access to Child, as well as monitoring of Child while Child was with each parent and continued therapy for Child. Without explanation, the Family Court further ordered that no one was to reveal where payment for the monitoring was coming from.

tapes (two of which were viewed by GAL # 2) in which Child states that Father had sexually abused her, including graphic filming (by Mother) of Child demonstrating what Father allegedly did to her; (2) after a meeting with Brewerton, GAL # 2, Child's therapist (**Fisher**), police detective Brad Rezents (**Rezents**), Dr. Moon, and two professionals from the Children's Justice Center, it was agreed that the contents of the videotapes warranted further investigation and a cessation of *Father's* visitation with Child pending the investigation; (3) Father reportedly agreed to stop visitation and to take "another" polygraph; (4) on September 19, 2005, Rezents requested and Mother agreed to take a polygraph, which reportedly "showed deception," although no details as to the nature of the deception were provided; and (5) on September 20, 2005, Mother sought a TRO against Father, based on allegations of Father stalking Mother.[7] Notably, between the time of the seven professionals' agreement that Father's visitation should be stopped pending further investigation and the GAL's decision to support Father's Ex Parte Motion, the only development in the abuse investigation was the oral report to GAL # 2 concerning Mother's polygraph test.

In the Ex Parte Order, Father's Ex Parte Motion was granted, without a hearing, by the Family Court on the same day Father's Ex Parte Motion was filed. No notice was provided to Mother prior to the entry of the Ex Parte Order, which awarded sole physical custody to Father and provided that Mother would be allowed supervised or monitored visitation only, as arranged by GAL # 2. On September 30, 2005, after Child was removed

from Mother's custody, certified copies of Father's Ex Parte Motion and the Ex Parte Order were served on Mother. The Ex Parte Order did not provide for an immediate post-deprivation hearing and Mother was not otherwise notified of any post-hearing proceeding at which she would have the opportunity to be heard on Father's Ex Parte Motion.[8] As directed in the Ex Parte Order, on September 23, 2005, Child was removed from Mother's custody with the assistance of Maui police.

On October 26, 2005, Cheryl R. Brawley, Esq. (**Brawley**), appeared on behalf of Mother and filed a motion to continue the November 17th and 18th trial on Sole Custody Motion # 1, based on Brawley's recent retention and inability to effectively represent Mother without more time.[9]

At about the same time, Father noticed oral depositions of Mother and Ernest R. Heller and issued subpoenas duces tecum to American Savings Bank, First Hawaiian Bank, Cellco Partnership d/b/a Verizon Wireless, Edward F. Clarke, Hawaiian Telcom, Activities 4–Less, Consolidate Resorts, and Fairfield Resorts.

On November 7, 2005, a pre-trial order was entered for a trial on November 17 and 18, 2005, consolidating for trial Sole Custody Motion # 1 and Father's Motion to Reduce Child Support. The pre-trial order stated that Mother's motion to continue trial was withdrawn.

On November 10, 2005, Father filed a witness and exhibit list identifying forty-seven witnesses and one hundred exhibits. Mother did not file a witness or exhibit list, but issued eleven subpoenas for witnesses at trial

---

7. This is the fourth TRO referenced by GAL # 2. Father's visitation with Child had been suspended at this time and, if true, Mother's sworn statements concerning Father's appearance at her workplace and questioning of her manager about her, may have reasonably been considered to be harassing. The record is silent as to whether GAL # 2 made any attempt to contact Mother's employer to either verify or refute Mother's allegations. The first TRO was issued when Father kept Child overnight without Mother's agreement and before the issuance of the *ex parte* order that confirmed Father's overnight visits. The second and third TROs are not part of the record in this case and no finding was ever made

that any of the TROs involved a willful misuse of the TRO process.

8. Father's reference in Father's Ex Parte Motion to an "evidentiary hearing set for November 17 & 18, 2005" apparently referred to a hearing on Sole Custody Motion # 1 and Father's Motion to Reduce Child Support.

9. The record does not reflect the reasons for prior counsel's withdrawal and Brawley's substitution, which roughly coincided with Mother's filing of bankruptcy and followed the Family Court's granting of the Ex Parte Order.

(Father issued approximately three dozen trial subpoenas).

No trial was conducted on November 17, 2005.[10] Instead, after lengthy off-the-record discussions, Father's counsel represented on the record that an agreement had been reached and stated the purported terms for the record. As Mother's counsel was beginning to state two clarifications, there was a glitch in the recording of the proceedings and no complete transcript is available. On March 16, 2006, orders (prepared by Father's counsel with no approval as to form by Mother or Mother's counsel) were entered based on the agreement purportedly reached by the parties on November 17, 2005 (**Purported Stipulated Orders**).[11] Mother later stated, in a sworn affidavit, that she understood that any "tentative agreement" made on November 17, 2005 was a continuance of the status quo pending the availability of the prior presiding judge (Judge Polak) and not a permanent resolution of legal and physical custody in favor of Father, as was later argued by Father and reflected in the Purported Stipulated Orders.[12]

In the meantime, Mother asked Brawley to withdraw as counsel and attempted *pro se* to initiate discovery and, on February 13, 2006, sought the removal of Lopez as GAL, based on Lopez's alleged withholding of "critical information" including reports that the polygraph tests cited by Lopez were unreliable (as well as inadmissible), Dr. Breithaupt's report of his psychological evaluation of Father, Dr. Moon's report indicating sexual abuse of Child, as well as allegations that Lopez had assumed a role of advocate for the Js and supported the Js' continued financial involvement in their payment of Father's attorneys' fees, GAL bills, court-ordered monitoring bills, and other payments associated with the case. Mother's motion, which was procedurally improper (filed *ex parte* and *pro*

se, although her counsel had not yet formally withdrawn from the case), was denied without a hearing. On February 21, 2006, the Family Court also entered an order quashing, without prejudice, subpoenas issued directly by Mother prior to her counsel of record's withdrawal from the case.

After Brawley filed a motion to withdraw as counsel, but before an order was entered granting the motion, Mother issued (*pro se*) another series of subpoenas, including a subpoena to the Js, seeking a broad range of financial information, most but not all of which was related, directly or indirectly, to the Js' financial involvement with Father, Mother, Child, and the various professionals and service providers associated with and/or during the custody dispute. On March 1, 2006, the Js filed a motion for a protective order. On March 6, 2006, Father filed an *ex parte* motion for protective order and to shorten time for a hearing to strike and quash Mother's discovery and to hold Mother in contempt of court. An *ex parte* order was entered on the *ex parte* motion quashing Mother's subpoenas until a further court order and setting a hearing on shortened time.

The Js' motion was granted at a hearing held on March 7, 2006. Thereafter, Mother and the Js both submitted forms of a written order regarding the Family Court's granting of the Js' motion for a protective order. Mother also filed an objection to the Js' form of order. The Js' form of order went well beyond the procedural defects in Mother's subpoena to state, as a basis for the protective order, that because Mother and Father "reached an Agreement on the disputed issues of custody and visitation on November 17, 2005," *none* of the information sought by Mother was relevant to any issue before the court. Notwithstanding that Mother's written objection to the form of order stated that

**10.** It appears that the Honorable Simone C. Polak was unavailable on that date. The Honorable Eric G. Romanchak presided.

**11.** In the 2004 Proceeding, the Family Court entered an Order On Petitioners' Petition to Modify Existing Child Custody Order and for Sole Legal and Physical Custody, Filed September 17, 2004. In the 2005 Proceeding, the Family Court entered an Order on Petitioner's Motion

for Post–Decree Relief Filed June 29, 2005. Together, these two orders entered on March 16, 2006, are referred to as the Purported Stipulated Orders.

**12.** Mother also averred that she never received any written stipulated order to sign and did not waive her right to present evidence to the court on the disputed issues.

she did not and never would have knowingly agreed to permanently give up custody of Child, the Family Court entered the Js' form of order and (without citation to any authority) sanctioned Mother by ordering her to pay the Js' attorneys' fees incurred in conjunction with the motion for protective order.

As noted above, on March 16, 2006, the Family Court entered the Purported Stipulated Orders, based on the "agreement" allegedly reached on November 17, 2005, which Mother steadfastly maintains was never intended by her to be a relinquishment of her custody of Child.

It appears from the record that, although Mother maintained steady employment, her financial situation had significantly deteriorated. As she withdrew as counsel, Brawley sought and obtained a "Judgment" from the Family Court against Mother for attorney's fees. The Js referred to Mother as "judgment proof" as they sought monetary sanctions against her related to the improper discovery. GAL # 2 refused to provide records to Mother because she had not paid all of her portion of the GAL fees. There is reference to and a general acknowledgment that Mother had filed for bankruptcy protection. However, there is insufficient information in the record for this court to evaluate whether and to what extent Mother's obligations related to this case may have been discharged.[13]

On June 1, 2006, Mother filed a motion for admission of counsel *pro hac vice* and to substitute counsel. In this motion, Mother sought the admission of three mainland lawyers, who had agreed to act as attorneys *pro bono publicus* for Mother, and a waiver of Disciplinary Board fees associated with their admission. A Hawaii-licensed attorney agreed to be associated as local counsel solely for the purposes of *pro hac vice* admission. The Family Court *sua sponte* granted the motion, but denied the waiver of the fees.[14]

On June 23, 2006, through her new counsel, Mother filed a motion to vacate, which sought to vacate the Ex Parte Order and both Purported Stipulated Orders (**Motion to Vacate**). The Motion to Vacate was primarily based on: (1) due process grounds; (2) the lack of evidence in the record regarding a "meeting of the minds" as to the alleged agreement of November 17, 2005, irregularities in the entry of the Purported Stipulated Orders;[15] (3) the inequitable circumstances of the November 17, 2005 hearing based on the alleged egregious violation of Mother's constitutional rights in conjunction with the *ex parte* order stripping her of custody of Child, substantially altering her procedural posture in the litigation; and (4) the lack of an appropriate "confirmation hearing" on November 17, 2005 to scrutinize the appropriateness and enforceability of the purported agreement.

After further submissions by both parties and an August 10, 2006 hearing, on August 17, 2006, the Order re Motion to Vacate was entered. As to Mother's request to vacate the Ex Parte Order, the Family Court ruled:

> [Mother's Motion to Vacate] is **denied in part** for the reason the Ex Parte Order was superseded by the parties having settled the case on November 17, 2005 as reflected by the Court's March 16, 2006, Order. [Mother] readily agrees that some agreement had been reached, but contends that it was temporary in nature, while

**13.** In conjunction with a motion for leave to proceed in forma pauperis, which was denied by the Family Court, Mother stated that she "declared personal bankruptcy in October 2005, which was completed February 1, 2006."

**14.** Thereafter, a motion for admission of counsel *pro hac vice* was filed by local counsel for Mother, who apparently also served as Mother's bankruptcy counsel. After various further filings by both parties, *pro bono pro hac vice* counsel Evan Nordby (an attorney in the Office of the Solicitor of Labor at the United States Department of Labor in Washington, D.C.) and Kristen A. Nilsen (a private attorney in Washington, D.C.) were admitted. A third *pro bono* attorney who sought to appear *pro hac vice*, Mr. Gregory F. Jacob (the Deputy Solicitor of Labor at the United States Department of Labor) withdrew (upon accepting a position as Special Assistant to the President for Domestic Justice Policy).

**15.** The alleged November 17, 2005 agreement was later memorialized in the Purported Stipulated Orders, the form of which apparently was not settled in accordance with the Family Court's instructions or applicable Family Court rules and were not signed by and apparently were not tendered to Mother or Brawley for signature.

[Father] contends it was intended to be a permanent order. Regardless of the characterization ascribed to the agreement, for purposes of the status of Ex Parte Order, either a temporary or a permanent order addressing the same issue (custody) as the Ex Parte Order will supersede and extinguish the Ex Parte Order. Therefore, this issue appears moot.

As to the Purported Stipulated Orders, the Family Court ruled:

> [Mother's Motion to Vacate] is **granted in part** and the [Purported] Stipulated Orders shall be and hereby are vacated.

Thus, it appears that the Family Court ruled that, in light of the subsequent order regarding custody, the Ex Parte Order was moot and therefore the court declined to set it aside. The Family Court nevertheless vacated the only other order awarding custody to Father, *i.e.*, the Purported Stipulated Orders. The Family Court did not explain in its written order how the Purported Stipulated Orders could be vacated yet still supersede and moot the Ex Parte Order. The Family Court's decision necessarily left the Ex Parte Order in place as the operative order regarding the custody of Child. In addition, the Family Court ordered a further hearing to set a new trial date for Sole Custody Motion # 1 and Father's Motion to Reduce Child Support.

On August 24, 2006, the Family Court set a pre-trial conference for February 1, 2007 and a trial setting for February 8, 9, and 12, 2007.

On August 29, 2006, Mother filed a Notice of Appeal from the Order re Motion to Vacate. On November 15, 2006, the Family Court entered Findings of Fact and Conclusions of Law regarding the Order re Motion to Vacate. On January 3, 2007, the Intermediate Court of Appeals dismissed Mother's appeal for lack of appellate jurisdiction because the Order re Motion to Vacate was not a final order and was not certified for interlocutory appeal.

A motion to continue the February 2007 trial for lack of Family Court jurisdiction, initiated prior to this court's denial of Mother's motion for reconsideration of the dismissal of the appeal, appears to have been granted. Father initiated a further subpoena duces tecum to Mother's employer and Mother sought records from Child's preschool.

On March 21, 2007, Father filed a motion for leave to relocate to the mainland with minor child (**Motion to Relocate**). In a declaration submitted with the Motion to Relocate, Father stated, *inter alia*, that: (1) he wanted to relocate to California as soon as possible; (2) Father had been offered a job with a (named) real estate appraisal company in California; (3) Father and Child would be living with a (named) family friend at a (specified) Costa Mesa, California, address; (4) upon approval of relocation, Child would be registered in the Costa Mesa elementary school identified in Father's declaration; (5) relocation would allow Child to be near family and friends of both Father's and Mother's (including the Js); and (6) the real estate appraisal job would allow Father to establish himself, become financially secure and provide for Child.[16] By the time the Motion to Relocate was heard on May 31 and June 1, 2007, along with other outstanding matters, Father testified that his reason for relocating was "family support." Although just two months had passed since Father's initial declaration regarding relocation, Father also

---

16. In his March 21, 2007 declaration, Father also stated: "I have found it very difficult to establish myself on Maui, especially with being solely responsible for [Child] and her care." We note that, with the first of Father's many filings to obtain sole legal and physical custody of Child (the September 17, 2004 Petition), Father stated in an undated declaration, *inter alia:* "I am now self-employed and have flexibility in my schedule. I am able to have our daughter on a full-time basis with reasonable visitation to [Mother]." In other words, after first arguing that his lack of regular employment should be a basis for granting him sole legal and physical custody of Child (thereby, incidentally, limiting Mother's custody of the toddler over whom she had had primary custody from birth), Father later (successfully) argued that his desire to change this employment situation was a basis for moving Child out of the State and, incidentally, away from Mother. The Family Court's post-trial Findings of Fact include: "The fact that [Father] has [Child] nearly all of the time without family support has hindered [Father's] ability to establish himself financially."

testified that: (1) Father intends to live with his mother and step-father, who live in Orange County, until he finds a place of his own; and (2) until he can finish the testing requirements to work for a real estate appraiser, he has "several jobs lined up in the construction industry." It appears that the particulars of Child's education in California were yet-to-be-determined.

In May of 2007, Mother issued subpoenas duces tecum to PACT (the agency that had been designated by the Family Court to supervise visits between Mother and Child) and Sherri Fisher, MA, an expressive arts therapist, who was Child's therapist (Fisher). Mother also served a discovery request, including interrogatories and a request for documents, on Lopez.

On May 24, 2007, Lopez filed a motion for protective order seeking not only to protect Lopez from Mother's discovery attempts— unless Mother paid Lopez in advance for the time to be expended to comply with the request[17]—but also to disallow Mother any discovery from Fisher. Although Lopez's reports and trial testimony relied on information and opinions provided to Lopez by Fisher, Lopez maintained that Mother was bound by a pre-engagement agreement (which was apparently unwritten and communicated to Fisher through Lopez) that Fisher would be "protected" from litigation, such as depositions, subpoenas, requests for documents, etc. Mother opposed the motion for protective order, arguing, *inter alia*, that the request for documents was necessary to Mother's cross-examination of Lopez on the basis for the GAL's report, which recommended that Father be awarded custody of Child. In

an attempt to secure the documents only, Mother twice narrowed her discovery requests, and offered to completely withdraw her request for answers to interrogatories if the requested documents would be provided.

On May 31 and June 1, 2007, the Family Court conducted a hearing and trial on the GAL's motion for a protective order, Father's Motion to Relocate, custody of Child, and, nominally, on whether the Ex Parte Order was unconstitutional. In the first instance, the Family Court granted Lopez's motion for a protective order and denied Mother any discovery from either Lopez or Fisher. The court deferred ruling on Mother's "Motion for Hearing to Dissolve or Modify Ex Parte Custody" until after hearing the evidence on the custody issues.[18] Over the course of two days, the Family Court heard the testimony of Jamie Baldwin,[19] Lopez, Father, Dr. Breithaupt, Mother, Dr. Moon, and Karina Coronesi.[20]

At the conclusion of the trial, the Family Court instructed the parties to submit proposed findings of fact and conclusions of law, in lieu of making closing arguments, and set a further hearing for June 22, 2007 to orally announce the court's decision. On June 19, 2007, the Family Court entered: (1) the Final Order; and (2) the Family Court's FOFs and COLs.

At the June 22, 2007 hearing, the Family Court explained its decision to award custody to Father and to grant the Motion to Relocate, as follows:

> [T]he Court agrees that both [Mother] and [Father] are very capable parents. I mean, the record shows that they are both

---

17. At the hearing on Lopez's motion for protective order, Lopez also argued that she should have had a full 30 days to respond to Mother's discovery. However, at a prior hearing attended (telephonically) by Lopez, the court's granting of Father's request to expedite a hearing on relocation and custody, which was supported by Lopez, was made dependent on Mother's being allowed expedited discovery. The timing of the discovery was not cited as a basis for the granting of the protective order.

18. Although the Family Court and Father's counsel state on the record that they had file-stamped copies of Mother's motion, the record on appeal does not include a copy of this motion.

19. Jamie Baldwin testified that, about two weeks before the hearing, she had been contacted by the attorneys for Father and Mother and GAL # 2 to participate in supervised visits between Mother and Child.

20. Karina Coronesi testified that she knew Mother and Child because her child had been in preschool with Child and the children had played together outside of school. Ms. Coronesi testified that Mother was a great mom who was very focused on the child, made sure Child was polite and eating well, and did all the things that a very caring mother would do.

lovable, they love [Child] very much, they have done all they can for their child. And that's what makes this a difficult case. But the Court has to make that decision.

And when the Court makes that decision, it determines what is in the best interest of the child, it must consider all the evidence and determine what is—what the weight must be given to the evidence. In this case the Court, as I stated, and the findings of fact and conclusion [sic] of law places great weight to the testimony of [Lopez], who has worked in that capacity on this case since February 2005 and thoroughly investigated, reviewed records, interacted with the parties, interviewed and consulted with other professionals throughout the case.

And although defendant has argued that the GAL may be biased and has questioned her objectivity, the Court finds to the contrary, that Ms. Lopez initially in this case did not recommend a change in custody. Custody should have remained with [Mother]. But after a while, after through her investigation [sic], again, like I said, she did change her mind.

And I think the reason why the recommendation was changed is [Father] had to prove himself. And he had to overcome many obstacles to do that. And, especially, the false allegation of sexual abuse. So I think he has done that. He has shown that through his actions and through the history of this case that, in his decision to relocate, he has done that in the best interest of the child, and where [he] will be better situated for [Child] in all aspects of the child's well-being. And the Court finds that it has been established by substantial evidence in accord with *Fisher v. Fisher.*

And during the trial, [Mother] has shown through her exhibit, one exhibit specifically, Respondent's 2, which has been labeled Exhibit R–2, should show a happy picture of her with the child at the birthday party. But [Father] has shown, through his actions and his diligence, on a daily basis, that he has and will continue to nurture and to ensure that [Child] will thrive in his custody. And [it is] in [Child's] best interest that he continue to have sole custody of [Child] and be allowed to relocate to California.

Mother timely filed a notice of appeal on July 19, 2007. It appears that, shortly after the Family Court's decision, Father moved to California because, on August 15, 2007, Mother filed an *ex parte* motion to enforce visitation rights. In this motion, which was granted by the Family Court, Mother sought the court's assistance in ensuring that Mother would be allowed to proceed with her allowed "monthly" visitation with Child, in California, on the weekend that a visitation supervisor was available and Mother had made work, travel, and supervision arrangements.

## II. *POINTS OF ERROR*

Mother raises the following points of error:

1. The Family Court erred in failing to find that the Ex Parte Order was unconstitutional and in finding that the constitutionality issue was moot;

2. The Family Court erred in denying Mother all discovery requested from GAL # 2 and Fisher and in disallowing testimony by Dr. Breithaupt on his opinion concerning the factual basis for Fisher's conclusions;

3. The Family Court erred in admitting into evidence offers to take polygraph tests and crediting GAL # 2's recommendations based in part on the results of polygraph tests;

4. The Family Court erred in failing to establish a specific visitation schedule, in imposing "vague and impossible" conditions for resumption of unsupervised visitation, including therapy for conditions that the uncontradicted expert testimony at trial stated that she did not have; and

5. The Family Court erred in entering FOFs 9, 14, 86, 89, 105, 106, 109, 114, 116, 130, 134, 185, 186, 191, 208, 213, 218, and 219.

## III. *APPLICABLE STANDARDS OF REVIEW*

Mootness is an issue of subject matter jurisdiction. "Whether a court possesses subject matter jurisdiction is a question of

law reviewable de novo." *Kahoʻohanohano v. Depʻt of Human Serv.,* 117 Hawaiʻi 262, 281, 178 P.3d 538, 557 (2008) (citation and internal quotation marks omitted).

■■■ "We answer questions of constitutional law by exercising our own independent judgment based on the facts of the case. Thus, we review questions of constitutional law under the right/wrong standard." *State v. Fields,* 115 Hawaiʻi 503, 511, 168 P.3d 955, 963 (2007) (internal quotation marks, citation, and ellipsis omitted).

■■■ "[A] trial court's FOFs are subject to the clearly erroneous standard of review." *Ueoka v. Szymanski,* 107 Hawaiʻi 386, 393, 114 P.3d 892, 899 (2005) (citations omitted).

An FOF is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed. An FOF is also clearly erroneous when the record lacks substantial evidence to support the finding. We have defined substantial evidence as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

*Bremer v. Weeks,* 104 Hawaiʻi 43, 51, 85 P.3d 150, 158 (2004) (quoting *Beneficial Hawaiʻi, Inc. v. Kida,* 96 Hawaiʻi 289, 305, 30 P.3d 895, 911 (2001)).

[The appellate] court reviews the trial court's COLs de novo. A COL is not binding upon an appellate court and is freely reviewable for its correctness. Moreover, a COL that is supported by the trial court's FOFs and that reflects an application of the correct rule of law will not be overturned.

*Bhakta v. County of Maui,* 109 Hawaiʻi 198, 208, 124 P.3d 943, 953 (2005) (internal quotation marks, citations, and brackets in original omitted).

Generally, the family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion. Thus, we will not disturb the family court's decisions on appeal unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.

*Fisher v. Fisher,* 111 Hawaiʻi 41, 46, 137 P.3d 355, 360 (2006) (quoting *In re Doe,* 95 Hawaiʻi 183, 189–90, 20 P.3d 616, 622–23 (2001)).

■■■ We review a trial court's granting of a protective order for an abuse of discretion. *See, e.g., Kukui Nuts of Hawaii Inc. v. R. Baird & Co., Inc.,* 7 Haw.App. 598, 620–21, 789 P.2d 501, 515 (1990).

## IV. DISCUSSION

### A. The Ex Parte Order

#### 1. The Issue of the "Constitutionality" of the Ex Parte Order Is Not Moot

In its June 19, 2007 FOFs and COLs, the Family Court concluded:

> The issue of whether this Court's September 23, 2005 Ex Parte order is unconstitutional is moot, as the parties have now had the hearing on the issues of custody and visitation as raised in the September 17, 2004 Motion and the September 23, 2005 Ex Parte Order.

As discussed below, the constitutional issues implicated in this case include both Mother's substantive liberty interest in the care, custody, and control of her child and her procedural due process right not to be deprived of a liberty interest without reasonable notice and a meaningful opportunity to be heard.

We consider whether the "constitutionality" of the Ex Parte Order is moot in light of applicable precedent stating:

> The mootness doctrine is said to encompass the circumstances that destroy the justiciability of a suit previously suitable for determination. Put another way, the suit must remain alive throughout the course of litigation to the moment of final appellate disposition. Its chief purpose is to assure that the adversary system, once set in operation, remains properly fueled. The doctrine seems appropriate where events subsequent to the judgment of the trial court have so affected the relations between the parties that the two conditions

for justiciability relevant on appeal—adverse interest and effective remedy—have been compromised.

*Hamilton v. Lethem,* 119 Hawai'i 1, 5, 193 P.3d 839, 843 (2008), (*quoting Lathrop v. Sakatani,* 111 Hawai'i 307, 312–13, 141 P.3d 480, 485–86 (2006)) (internal citations omitted) (format altered); *see also In re Doe Children,* 105 Hawai'i 38, 57, 93 P.3d 1145, 1164 (2004) (stating that "the two conditions for justiciability relevant on appeal [are] adverse interest and effective remedy").

The Family Court's mootness determination rests on the fact that the court eventually held a hearing on the issues of custody and visitation.[21] In essence, the Family Court ruled that any failure of due process in the initial custody determination was remedied and, therefore, mooted by the hearing that was held approximately twenty months later. Mother argues that, under the circumstances of this case, that remedy was inadequate because of the collateral consequences of the Ex Parte Order. Mother also argues that the central issue in this appeal, whether a parent can be deprived of his or her liberty interest in the care, custody, and control of his or her child, without prior notice and an opportunity to be heard, is a matter that affects the public interest and, therefore, falls within the public interest exception to the mootness doctrine. Finally, Mother argues that the issue remains justiciable on appeal because an *effective remedy* is available in this case: a new trial untainted by the impacts of the Ex Parte Order.

The Ex Parte Order, which awarded full legal and physical custody to Father and allowed Mother only weekly supervised visits with then three-year-old Child unquestionably affected the outcome of the hearing on custody and relocation. This impact is directly evidenced by the Family Court's FOFs, including the following:

9. Based upon the information provided in the September 23, 2005 Ex Parte Motion, including the Declaration of the Guardian Ad Litem In Support Of a Change in Physical Custody, this Court found that an immediate change in custody was in the best interests of the minor child to insure the safety and welfare of the minor child, pending further hearing.[22]

. . . .

124. This court granted [Father's] September 23, 2005 ex parte motion and issued is [sic] ex parte order.

125. Since that September 23, 2005 order, [Father] has had sole physical custody of [Child] and [Mother] has had supervised visits only at PACT in Wailuku.[23]

126. Since the September 23, 2005 order, it appears that [Child] has thrived while in [Father's] care.

---

21. Father never argued that the constitutional issue was moot. Instead, in opposition to the Motion to Set Aside, Father argued that the constitutionality argument was a red herring because he had relied on HRS § 571–46, rather than Hawaii Family Court Rules (**HFCR**) Rule 65, in support of his *ex parte* request for a change in custody. Father essentially argued that an *ex parte* change of custody is supported by the language in HRS § 571–46 stating: "where there is at issue a dispute as to the custody of a minor child, the court, during the pendency of the action, at the final hearing, or any time during the minority of the child, may make an order for the custody of the minor child as may seem necessary or proper." Father also claimed that his HFCR Rule 65 request was to restrain Mother from disseminating the "disturbing videotapes" Mother had made of Child. Although the Ex Parte Order in this case does not include any finding that Child was at risk of immediate danger, Father argued that it is proper to issue an order changing custody, without prior notice or a hearing, when a child is at risk of immediate

harm. Father also argued that the "subsequent report of the GAL and opinion of the professionals involved with the minor child and the parties" supported the declarations of Father and GAL #2 that accompanied Ex Parte Motion. Notwithstanding three extensions of time to do so, Father did not file an Answering Brief on appeal. Nevertheless, in light of the paramount consideration of Child's best interests, we have carefully reviewed all of Father's arguments below.

22. This FOF is clearly erroneous. Although the Ex Parte Order immediately changed custody, it did not include any findings concerning the best interest, safety, or welfare of Child.

23. Mother's visitations at PACT were terminated in October of 2006. From that point to the custody and relocation hearing, Mother and Child had a single visitation supervised by GAL #2, at which Mother hosted a birthday party for Child with other children and moms.

131. Ms. Fisher reported that [Father] has been working on strengthening his parenting skills.

132. Ms. Fisher reported that [Father] is doing a great job in parenting [Child].

133. Ms. Lopez opined that her investigation has lead [sic] her to conclude that [Child] is happy, settled and very much connected to [Father].

. . . .

151. [Father] testified that [Child] and he are basically here on Maui alone, since [Mother's] access has been so limited and she has not shown that she really wants to co-parent.

. . . .

168. On Maui, [Father] is [Child's] sole caregiver. Except for the times that [Child] is in school, [Father] has no respite, as [Mother] only has supervised visits.

. . . .

170. The fact that [Father] has [Child] nearly all of the time without family support has hindered [Father's] ability to establish himself financially.

. . . .

208. This court finds that there has been no compelling evidence to controvert Ms. Lopez's conclusions regarding custody, visitation and relocation.

209. The credible evidence is that [Child] has thrived in [Father's] sole custody since September 2005.

210. The credible evidence is that [Child] is well taken care of by [Father] and that they have a bonded, close, loving and nurturing relationship.

211. [Father] should continue to have sole physical custody of [Child].

The impact of the Ex Parte Order on the outcome of the custody and relocation issues is further demonstrated in the Family Court's comments when it announced its ruling on June 22, 2007:

... And the Court agrees that both [Mother] and [Father] are very capable parents. I mean, the record shows that they are both lovable, they love [Child]

very much, they have done all they can for their child. And that's what makes this a difficult case. But the Court has to make that decision.

And when the Court makes that decision, it determines what is in the best interest of the child, it must consider all the evidence and determine what is-what the weight must be given to the evidence. In this case, the Court, as I stated, and the findings of fact and conclusion [sic] of law places great weight to the testimony of [Lopez][.]

. . . .

And during the trial, [Mother] has shown through her exhibit, one exhibit specifically, Respondent's 2, which has been labeled Exhibit R–2, should show a happy picture of her with the child at the birthday party. But [Father] has shown, through his actions and his diligence, on a daily basis, that he has and will continue to nurture and to ensure that [Child] will thrive in his custody. And in [Child's] best interest that he continue to have sole custody of [Child] and be allowed to relocate to California.

Clearly, the Ex Parte Order's change of this pre-school-age child's custody from Mother, as the primary custodial parent, to Father, as the sole custodial parent, had a significant and substantial impact on the Family Court's decision to order that Father should "continue" to have sole physical custody and be allowed to relocate to California with Child, while Mother (a Maui resident) would be allowed supervised visits with Child in California, as often as once per month, at Mother's expense.

 We conclude that, although a hearing was ultimately held on the custody issues in this case, in light of the significant, unmitigated impact of the Ex Parte Order on the outcome of that hearing and the availability of an effective remedy through this appeal, the issues concerning the constitutionality of the Ex Parte Order are not moot. Even if the constitutional issues were considered to be moot because of the conduct of the custody hearing, the collateral consequences exception to the mootness doctrine is applica-

ble in this case. *See Hamilton,* 119 Hawai'i at 7, 193 P.3d at 845.[24]

### 2. *Mother's Fundamental Liberty Interest and Right to Procedural Due Process*

█ A parent's right to the "care, custody and control" of his or her child is a fundamental liberty interest protected by the United States Constitution. *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) ("[T]he interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court."). Hawai'i too has long recognized that parents have a substantive, fundamental liberty interest in raising their children.

> We affirm, independent of the federal constitution, that parents have a substantive liberty interest in the care, custody, and control of their children protected by the due process clause of article 1, section 5 of the Hawai'i Constitution. Parental rights guaranteed under the Hawai'i Constitution would mean little if parents were deprived of the custody of their children without a fair hearing.
>
> . . . .
>
> Furthermore, the Supreme Court has said that parental rights cannot be denied without an opportunity for them to be heard at a meaningful time and in a meaningful manner.

*In re Doe,* 99 Hawai'i 522, 533, 57 P.3d 447, 458 (2002); *see also Doe v. Doe,* 116 Hawai'i 323, 334–35, 172 P.3d 1067, 1078–79 (2007) (citing several Hawai'i cases recognizing that parents have a fundamental liberty interest in the companionship, care, custody and management of their children); *In re Doe,* 77 Hawai'i 109, 114–15, 883 P.2d 30, 35–36 (1994) (recognizing parents' fundamental liberty interest in the care, custody, and management of their children).

█ There is no question that Mother had a fundamental liberty interest in her right of care, custody, and control of Child. Thus, under the Fourteenth Amendment of the United States Constitution and article 1, section 5 of the Hawai'i Constitution, the State may not deprive her of this interest without providing a fair procedure for deprivation. *See In re Doe,* 108 Hawai'i 144, 118 P.3d 54 (2005); *In re Doe,* 99 Hawai'i at 533, 57 P.3d at 458; *see also In re Doe Children,* 85 Hawai'i 119, 123, 938 P.2d 178, 182 (App. 1997). "At its core, procedural due process of law requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner before governmental deprivation of a significant liberty interest." *State v. Bani,* 97 Hawai'i 285, 293, 36 P.3d 1255, 1263 (2001) (citations omitted).

█ Mother argues that the Ex Parte Order deprived her of custody of Child without the constitutionally required procedural protections. We agree. Although due process is not a fixed concept requiring specific

---

**24.** In addition, we agree with Mother that the public interest exception to the mootness doctrine is applicable here. In *Doe v. Doe,* 116 Hawai'i 323, 327, 172 P.3d 1067, 1071 (2007) (citations omitted), the Hawai'i Supreme Court reiterated its earlier holding that "when the question involved affects the public interest and an authoritative determination is desirable for the guidance of public officials, a case will not be considered moot." The analysis required to determine whether the public interest exception should be invoked includes: "(1) the public or private nature of the question presented; (2) the desirability of an authoritative determination for future guidance of public officers, and (3) the likelihood of future recurrence of the question." *Id.*

Although this case clearly involves a custody battle between Mother and Father, the Family Court's use of *ex parte* proceedings to immediately change custody from one parent to another,

without notice or a hearing, stands to affect the fundamental rights of many Hawai'i families. Particularly in light of Father's position that HRS § 571–46 authorizes, without limitation, *ex parte* custody decisions, the Family Court's refusal to address the constitutionality of the *ex parte* ruling, and the lack of guidance on this issue, it is our view that a determination on this issue will provide needed guidance. As to the third factor, Mother points out that the Family Court issued no fewer than four significant *ex parte* orders in this case alone. While not all of those orders are the subject of this appeal, it appears the use of *ex parte* rulings is not uncommon and that there is a strong likelihood that the issue presented here could recur. We are also mindful of the enormous impact of custody decisions on children and families, and the difficulties and limitations inherent in seeking appellate review of a custody determination.

procedures in every situation,[25] under Hawai'i law, due process generally requires that notice and an opportunity for an appropriate hearing be afforded *before* deprivation of the protected liberty interest, except in emergency situations. *See, e.g., Slupecki v. Admin. Dir. of Courts,* 110 Hawai'i 407, 413, 133 P.3d 1199, 1205 (2006) (requiring prior notice of process allowing petitioner to seek to set aside default in administrative driver's license revocation proceedings); *Bani,* 97 Hawai'i at 298, 36 P.3d at 1268 (2001) (convicted sex offender entitled to notice and opportunity to be heard on the issue of whether he posed a threat to the community *prior* to public notification of his status as a sex offender); *accord Brokaw v. Mercer County,* 235 F.3d 1000, 1020 (7th Cir.2000) ("Minimally, [due process] also means that governmental officials will not remove a child from his home without an investigation and a pre-deprivation hearing resulting in a court order of removal, absent exigent circumstances."); *Hollingsworth v. Hill,* 110 F.3d 733, 739 (10th Cir.1997) ("Removal of children from the custody of their parents requires pre-deprivation notice and a hearing except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.") (internal quotation marks and citation omitted).

The Family Court did not specify upon which legal authority the Ex Parte Order was issued. Mother was not provided notice or an opportunity to be heard before the Ex Parte Order was issued. The Family Court did not make *any* findings in support of the Ex Parte Order, much less a finding of exigent circumstances or immediate, imminent, irreparable harm to warrant deprivation without a hearing. The Family Court did not, at any point in the proceedings, set a post-deprivation hearing at which evidence was taken on the contentions raised in Father's Ex Parte Motion. *See, e.g., Brown v. Thompson,* 91 Hawai'i 1, 12 n. 13, 979 P.2d

586, 597 n. 13 (1999) ("Where extraordinary circumstances justify dispensing with a pre-deprivation hearing ... a *prompt* post-deprivation hearing must be provided.") (emphasis added); *see also Jordan by Jordan v. Jackson,* 15 F.3d 333, 343 (4th Cir.1994) ("[I]t is well-settled that the requirements of process may be delayed where emergency action is necessary to avert imminent harm to a child ... provided that adequate post-deprivation process to ratify the emergency action is promptly accorded.") (internal citations omitted); *O'Donnell v. Brown,* 335 F.Supp.2d 787, 813 (W.D.Mich.2004) (as this case involved no emergency, post-deprivation remedies for removal of children were inadequate and parents suffered a procedural due process violation). Although a hearing was later held on the issues of custody and visitation generally, by then, the die was cast. Father was the custodial parent and Mother's contact with Child had been reduced to infrequent, supervised visits of short duration.

We hold that, under the Hawai'i Constitution, absent express findings of exigent or emergency circumstances, due process requires that a parent be given notice and an opportunity to be heard prior to a change in primary physical or legal custody in family court custody matters such as this one.[26] Absent evidence that harm is likely to result from the delay necessary to set a hearing, no parent involved in a custody dispute should have his or her child removed by the police, without notice of the grounds for removal and an opportunity to be heard on the charges. As evidenced by this case, custody disputes are particularly susceptible to dueling allegations of misconduct and abuse. Absent a true emergency, *ex parte* custody proceedings can provide fertile ground for a misuse of the judicial process.

We further hold that, if a family court determines that an emergency situation requires an immediate change of custody, then the *ex parte* order changing custody

---

**25.** *Korean Buddhist Dae Won Sa Temple v. Sullivan,* 87 Hawai'i 217, 243, 953 P.2d 1315, 1341 (1998).

**26.** This opinion does not address and does not apply to any custody matters under HRS Chapter

587, including but not limited to protective police custody and/or temporary foster custody pursuant to that chapter; nor does it address domestic abuse protective orders under HRS Chapter 586.

must include notice of: (1) a post-deprivation hearing, promptly set; and (2) the grounds for this extraordinary measure. A parent deprived of custody in this manner must be given a prompt and meaningful opportunity to address the allegations supporting the immediate change of custody.

 Under the facts of this case, we are unable to conclude that the violation of Mother's constitutional rights was harmless.

### B. *The Protective Order*

The protective order entered by the Family Court on June 22, 2007 (**Protective Order**), states, in relevant part:

> 1. [GAL # 2]'s Motion for Protective Order filed on May 24, 2007 is granted as to the discovery requests made by [Mother] on or about May 4, 2007 to [GAL # 2] and as to subpoenas issued to [Fisher] on or about May 16, 2007.
>
> 2. The discovery is not permitted.

Mother alleges that the Family Court erred in disallowing her any discovery from Lopez and Fisher. HFCR Rule 26(c) provides:

> (c) Protective Orders. Upon motion by a party or by the person from whom discovery is sought, accompanied by a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition, the court in the circuit where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . .

 As the moving party, Lopez had the burden of showing good cause to support the issuance of a protective order. *See, e.g.,* 8 Wright, Miller & Marcus, *Federal Practice and Procedure: Civil 2d* § 2035 (1994); *In re Terra Int'l, Inc.,* 134 F.3d 302 (5th Cir.

1998); *Glenmede Trust Co. v. Thompson,* 56 F.3d 476 (3d Cir.1995).[27] In determining whether good cause exists for issuance of a protective order under HFCR Rule 26(c), "the court must balance the requesting party's need for information against the injury that might result if uncontrolled disclosure is compelled." *Brende v. Hara,* 113 Hawai'i 424, 431, 153 P.3d 1109, 1116 (2007) (citations omitted). In this case, determining whether there was good cause for the issuance of the blanket protective order required a balancing of Mother's legitimate discovery needs in the context of this case against the injury or burden that might result to Lopez and Fisher from being required to respond to any of Mother's discovery requests.

### 1. *Discovery from Lopez*

We first consider Mother's request for discovery from Lopez. Mother served Lopez with interrogatories concerning, *inter alia,* her communications with Father, the Js, the Family Court (including any *ex parte* communications), Dr. Moon, and others, payments received from or on behalf of Father, various facts, information, and communications related to Father's Ex Parte Motion and Lopez's opposition to the Motion to Vacate, and other queries related to opinions, documents, and information relied on or discounted by Lopez. Mother's request for documents included the documents in Lopez's GAL file or files in this matter, draft GAL reports, documents received from any therapist or service provider, records concerning her time spent on this matter, documents related to her communications with Father and with DHS, and any documents regarding Father's history of domestic violence. In her attempts to reach a compromise with Lopez, Mother ultimately offered to withdraw all interrogatories and all document requests, except the first one, which sought access to Lopez's GAL file or files in this matter.

Lopez raised no objection to the discovery sought based on relevance, privilege, or other substantive grounds; rather, she primarily

---

**27.** In reviewing matters under Hawai'i Rules of Civil Procedure (**HRCP**) Rule 26(c), the Hawai'i Supreme Court has looked to parallel federal law for guidance. As HFCR Rule 26(c) is, in relevant part, parallel to HRCP Rule 26(c), we will look to federal case law, as well as Hawai'i cases on HRCP Rule 26(c).

objected on the grounds that Mother had paid only a *de minimis* portion of her GAL's fees and requested that Mother be required to "advance at least $1600 for [Lopez's] time to comply with [Mother's] request"[28] or that the discovery be denied. Lopez's declaration stated, in part:

14. I have continued to do my work as GAL, via investigation, court appearances on Maui, writing of reports and correspondence, attendance at meetings, contacts with collateral sources, with PACT and with other supervisors to supervise visits between [Mother] and [Child]. My total GAL fee to date is $30,981.00.

15. I expect to be paid for my work. [Mother] has violated the court order by failing to pay what she owes me. [Mother] now expects me to continue to work on her behalf, without pay.

16. It is an undue burden and expense for me to comply with [Mother's] discovery requests.

We note that neither the Lopez Declaration nor the record in this case contain any invoices or other records concerning the requested GAL fees. It does not appear that the GAL fees were submitted to or approved by the Family Court and, in response to the motion for protective order, Mother stated that she had never received any invoices from Lopez. Mother also claimed to have paid Lopez more than the amount reported to the court by Lopez. It is unclear how much of Mother's half of the purported $30,981 in GAL fees was discharged in bankruptcy.

In its oral ruling on Lopez's motion for protective order, the Family Court stated:

The Court notes that there is a prior court order where the Court—and the parties, by agreement, where the GAL and the therapist were—could be restricted as far as discovery and cross-examination.

And although, [Mother's counsel], you have argued, and I note in your memo in opposition, that the GAL failed to include certification, that she attempted to resolve this dispute in good faith under—and you cite Hawaii Family Court Rule 26(c)—looking at the GAL's declaration—and I am referring to paragraph seven and eleven—shows that there was good faith attempts by her to resolve this with you. And, also, her arguments in court.

And as far as your argument that the GAL [sic] must comply with the subpoena, and you cited Hawaii Family Court Rule 45(b) in your memo in op, you know, the court may quash a subpoena if it's unreasonable or oppressive, and it seems like that's what happens—what happened before with the prior judge regarding a subpoena.[29]

The Court notes, again, based on the agreement, which was pursuant to court order, and agreed to by all parties, that the GAL's duties do not include responding to discovery requests. The GAL—and I would note based on the evidence today—was only paid $75 by your client. And the—her total bill was over $30,000.

I am not saying that [is] a reason why I am denying it. That's just another factor to consider.

And, again, that Subsection D of the court order says that the court may restrict discovery and cross-examination of the GAL and any therapist. And the factors will include harm to the child, harassment of litigious parties, depletion of marital and personal resources. I think all of those factors apply in this case.

So I am going to grant the Motion for Protective Order regarding discovery requests by both the GAL and the therapist Sherry Fisher at this time.

The record does not reflect any balancing of Mother's need for discovery from Lopez against Lopez's claim that she needed to be advanced $1,600 for the time

---

28. It appears from Lopez's declaration that the request for a $1,600 advance was based on an offer from Mother to reduce the number of interrogatories and document requests. Thereafter, Mother further offered to reduce her discovery to a single document request.

29. The comparison to the quashing of Mother's earlier subpoenas appears to be inapposite. As noted above, with one exception, Mother's subpoenas were quashed because she initiated them on a *pro se* basis before her prior counsel's withdrawal was formalized.

she anticipated it would take to respond to (limited) interrogatories and document requests (even though Mother had waived the interrogatories and reduced her document request to a single request). Even in the absence of a prior order, a court may restrict discovery. However, that discretion does not supplant the requirement to weigh a party's legitimate discovery needs. *See Brende*, 113 Hawai'i at 431, 153 P.3d at 1116. As the motion for protective order did not cite any harm to the child or harassment, it seems that the determinative issue was Mother's failure to pay the outstanding GAL fees.[30]

█ We consider the relevance or potential relevance of Lopez's files to Mother's position in this case. Lopez was, without question, Father's key witness in the case. Lopez filed two GAL Reports that included no supporting documents, written communications, or opinions, instead referencing a variety of contacts and materials relied on by her. Lopez's testimony occupied nearly all of the first day of the two-day trial. Lopez recommended that Father be granted sole legal and physical custody of Child and recommended approval of Child's relocation to California with Father. The Family Court accorded "great weight" to her testimony and, in ruling in favor of Father, found that there was "no compelling evidence to controvert [Lopez's] conclusions regarding custody, visitation and relocation."[31] Under the circumstances of this case, Mother was entitled to review the documents and materials relied upon by Lopez, as well as any documents and materials provided to and discounted by Lopez. *See, e.g., Kelley v. Kelley*, 175 P.3d 400, 403 (Okla.2007) (parties in a custody proceeding have the right to cross-examine the GAL and to seek discovery concerning the basis for a custody recommendation);[32] *In re*

30. While the Family Court also noted depletion of marital or personal assets, that factor can be considered properly only in the context of the case. Obviously, Mother and Father were never married and there is no financial impact to Father flowing from Mother's access to the GAL's files. Thus, Father's only interest was strategic. Indeed, under the circumstances of this case— wherein Father issued over 40 subpoenas (not counting trial subpoenas) to GAL # 1, Mother's employers, telephone service providers, and health care providers, Child's preschool, DHS/ CWS, Dr. Moon, Dr. Breithaupt, Dr. Kepler, Brewerton, Dr. Choi, Mother's banks, Mother's stepfather, and others—Mother's request for discovery from GAL # 2 and Fisher was highly relevant and reasonable in scope. Father apparently had no need to seek discovery from Lopez or Fisher. From the time that Lopez attached her declaration to Father's Ex Parte Motion to the evidentiary hearing, Lopez appeared to be working closely with Father and his counsel. At trial, Lopez testified that Fisher was seeing Father "as a client," in addition to her role as Child's therapist. We also reject the notion of a *per se* rule or presumption that a GAL's duties do not include responding to discovery. As with other discovery, a balancing of legitimate discovery needs with any resulting harms or burdens to the GAL is necessary.

31. This court has been unable to identify any statute, rule, or case law that would require Mother to marshall "compelling evidence" to controvert the GAL's conclusions. Indeed, it appears that, as the party seeking to modify or change custody in this case, Father had the burden to show that "the best interests of the child require or justify the modification." HRS § 571–46(6).

32. In *Kelley*, a father petitioned for a writ of mandamus, asserting that a statute that shielded the GAL from discovery and a family court order prohibiting the GAL from being called as a witness were unconstitutional. 175 P.3d at 401. The Oklahoma Supreme Court granted the writ and held that: (1) "[d]ue process necessitates that a parent have the right to cross-examine the guardian *ad litem* once the guardian's report is proffered to the trial court"; and (2) the statute barring discovery of the GAL, insofar as it "negates the right of a parent to cross-examine the guardian concerning the contents of the report and the basis for a custody recommendation," is an "unconstitutional restraint on the parent's fundamental rights to the care, custody, companionship and management of his or her child." 175 P.3d at 406. The court reasoned that the "overwhelming majority of the states addressing the parental right to cross-examine a guardian *ad litem* have held either expressly, or by necessary implication, that an order or decree awarding or modifying custody must be based on evidence heard in open court in observance of the requirements of due process." *Id.* at 404–05 (citing examples from Washington, Tennessee, Ohio, Montana, South Carolina, Connecticut, Alabama, Colorado, New Mexico, Maryland, and Indiana). It further stated that a family court's reliance on evidence/reports untested by cross-examination would be "fundamentally unfair" and would "amount to private investigations by the court ... out of the sight and hearing of the parties, who are deprived of the opportunity to defend, rebut or explain." *Id.* at 406.

*Hoffman,* 97 Ohio St.3d 92, 776 N.E.2d 485, 489 (2002) ("[I]n a permanent custody proceeding in which the guardian ad litem's report will be a factor in the trial court's decision, parties to the proceeding have the right to cross-examine the guardian ad litem concerning the contents of the report and the basis for a custody recommendation."); *In re Kosek,* 151 N.H. 722, 871 A.2d 1, 7 (2005) ("[T]he right to be heard in custody and visitation cases encompasses the right to call and cross-examine witnesses, to be informed of all adverse evidence, and to challenge such evidence."); *In re Dolly D,* 41 Cal.App.4th 440, 446–47, 48 Cal.Rptr.2d 691, 695–96 (1995) (holding that the trial court deprived Father of due process when it prohibited cross-examination of the author of a "highly conclusory" report regarding custody).

■ Although it might have been a reasonable exercise of the Family Court's discretion to condition the production on payment of Lopez's hourly fees and any costs related to the production, on the evidence and argument before the Family Court, it was unreasonable to deny production entirely based on Mother's failure to pay past, uncertified, possibly uninvoiced fees, some of which had been discharged in bankruptcy. Other remedies were available to address unsatisfied GAL fees. Indeed, in the February 3, 2005 Order Appointing [Lopez as] Guardian Ad Litem, the Family Court erroneously stated that "[p]roceeding to trial automatically will be certified as sufficient cause to compensate the GAL beyond the statutory maximum." It appears that this language was intended to avoid the requirement that the court review and certify the necessity of any payment to Lopez in excess of the statutory maximum. At all times relevant to this case, HRS § 571–87(b) (2006) stated, in relevant part:

**§ 571-87. Appointment of counsel and guardian ad litem; compensation.**

. . .

(b) *The court shall determine the amount of reasonable compensation to* appointed counsel and *guardian ad litem,* based on the rate of $40 an hour for out-of-court services, and $60 an hour for in-court services with a maximum fee in accordance with the following schedule:

. . . .

(2) *Cases arising under chapters 560, 571, 580, and 584 . . . $1,500.*

*Payments in excess of any maximum provided for under paragraphs (1) and (2) may be made whenever the court in which the representation <u>was rendered</u> certifies that the amount of the excess payment is necessary to provide fair compensation and the payment is approved by the administrative judge of such court.*

(Emphasis added.)

■ Under the plain reading of this statute, a court does not have the discretion to issue a blanket pre-approval of all fees in excess of the statutory maximum. The statute mandates a determination of the reasonableness of a GAL's fees, a finding of necessity as to the amounts in excess of the maximum stated in the statute, and the court's approval of the fees. The record in this case is devoid of any determination of the reasonableness, necessity, and approval of Lopez's fees.

We conclude that the Family Court could have placed reasonable conditions on the discovery, such as advancement of payment or immediate payment for the GAL's time and expenses reasonably incurred in the document production, and could have placed reasonable limitations on the scope of the discovery, such as limiting the production to documents not provided to Mother's previous counsel (assuming that segregation of documents would not have been more burdensome, time-consuming, and expensive). However, the Family Court abused its discretion in granting, without limitation, Lopez's request to preclude any production of the GAL's documents to Mother.

### 2. Subpoena to Fisher

On May 16, 2007, Mother filed and served Fisher with a subpoena duces tecum (along with a notice of production of documents in lieu of deposition) seeking any and all documents regarding Father, Mother, and Child, including notes, correspondence, reports, observations, and evaluations, as well as a sub-

poena to appear at trial. The subpoena duces tecum requested that the documents be made available for pick-up no later than May 22, 2007. Father and Lopez were served by mail with copies of the subpoenas. HFCR Rule 45 provides, in relevant part:

**Rule 45. Subpoena**

. . . .

(b) *For production of documentary evidence.* A subpoena may also command the person to whom it is directed to produce the books, papers, documents, or tangible things designated therein; but the court, upon motion made promptly and in any event at or before the time specified in the subpoena for compliance therewith, may (1) quash or modify the subpoena if it is unreasonable and oppressive or (2) condition denial of the motion upon the advancement by the person in whose behalf the subpoena is issued of the reasonable cost of producing the books, papers, documents, or tangible things.

. . . .

(d) *Subpoena for taking depositions; place of examination.*

(1) Proof of service of a notice to take deposition as provided in Rules 30(b) and 31(a) constitutes a sufficient authorization for the issuance by the clerk of the circuit court of the circuit in which the deposition is to be taken of subpoenas for the persons named or described therein. The subpoena may command the person to whom it is directed to produce and permit inspection and copying of designated books, papers, documents, or tangible things which constitute or contain matters within the scope of the examination permitted by Rule 26(b), but in that event the subpoena will be subject to the provisions of Rule 26(c) and subdivision (b) of this Rule 45.

The person to whom the subpoena is directed may, within 10 days after the service thereof or on or before the time specified in the subpoena for compliance if such time is less than 10 days after service, serve upon the attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials except pursuant to an order of the court from which the subpoena was issued. The party serving the subpoena may, if objection has been made, move upon notice to the deponent for an order at any time before or during the taking of the deposition.

Fisher, as the "person to whom the subpoena is directed," failed to serve a written objection on Mother's attorney before the time specified for compliance with the subpoena or any time thereafter.

Lopez presumably sought the Protective Order for Fisher in her role as GAL for Child, and thus as a party in the case [33]—and not as an attorney or representative of Fisher. Lopez argued that Mother should be denied all discovery from Fisher on the grounds that: (1) the copy of the subpoena attached to the notice of production of documents in lieu of taking a deposition was not signed and sealed by the clerk of court (although it is undisputed that the original subpoena served on Fisher was "signed and sealed"); (2) in early 2005, the parties and their attorneys orally agreed that Fisher would be "protected from litigation;" and (3) Mother had failed to pay her share of Fisher's fees as Child's therapist. Lopez requested that if the court were inclined to order Fisher to comply with the subpoenas, Mother should be ordered to pay all moneys due to Fisher, along with payment for Fisher's time to produce the documents and to give expert testimony. Fisher did not provide a declaration to the court supporting Lopez's assertions; no invoices or other documentation of Fisher's fees were provided.

 In response to Lopez's motion, Mother objected to the untimeliness of an objection on behalf of Fisher, argued that Lopez did not have standing under HFCR Rule 45 to object to the subpoenas to Fisher, and argued that the lack of a clerk's signature and seal on the service copy of the documents subpoena did not invalidate the subpoena. We conclude that, under HFCR

---

**33.** The question of whether a GAL is a party in custody proceedings, for all purposes including discovery, was not raised as an issue in this appeal.

Rule 45, an objection on behalf of Fisher was indeed untimely. Thus Fisher was in jeopardy of being deemed in contempt of court pursuant to HFCR Rule 45(f). However, as a party to the proceeding, Lopez had standing under HFCR Rule 26(c) to seek to limit Mother's discovery from Fisher. We agree with Mother that Lopez's argument based on the service (on the parties) of an unfiled copy of the subpoena is meritless. *See* HFCR Rule 5(d). Regarding her need for discovery and testimony from Fisher, Mother argued that the unwritten agreement was entered based on an understanding that there would be voluntary, open communications between Fisher and all parties and that Fisher's role was to provide support for Child, not to provide an opinion favoring one party's custody over the other's.

 The record is unclear as to the exact scope of and assumptions related to the parties' oral agreement not to involve Fisher in the litigation. Even written stipulations may be set aside when subsequent, unanticipated events render discovery essential and make it "inequitable to enforce [an] agreement ... closing the door to the development of potentially critical facts." *In re Westinghouse Elec. Corp.–Uranium Lit.*, 570 F.2d 899, 902 (10th Cir.1978). In this case, Fisher waived any claim to be sheltered from court proceedings when she initiated communications intended to influence the outcome of the dispute. For example, in July of 2006, Fisher sent an email to Father and Lopez (and requesting an email address for Mother) with the subject line "letter to the court for July 12, 2006." In the email, Fisher stated, *inter alia*, "Here is my statement to the court concerning [Child's] therapy.... In my professional opinion, increase in visitation and especially unsupervised visitations should not happen until both parents are engaged in their personal therapy and actively participating in co-parenting sessions." At the hearing on Lopez's motion, Mother's counsel further explained her need for formal discovery from Fisher and the problems encountered in seeking information from her.

[Mother] just wants information from [Fisher] on the same terms that [Father] and [Lopez] have gotten that information. She is entitled to it without a subpoena because she has joint legal custody of the child.... Here, we simply asked [Fisher], in preparation for this hearing, simply for a copy of a letter she wrote with her recommendation for this hearing. It's the March 20, 200[7], letter to the guardian ad litem. And she said no.

In addition, Lopez relied substantially on Fisher's views in both her GAL Reports and her testimony at trial. "An individual must have an opportunity to confront all the evidence adduced against him, in particular that evidence with which the decisionmaker is familiar." *Vanelli v. Reynolds School Dist.*, 667 F.2d 773, 780 (9th Cir.1982). Finally, Lopez's trial testimony that Fisher was seeing Father "as a client," while she was providing therapy to Child and providing opinions supporting Father's position that he should retain sole legal and physical custody, casts doubt on Fisher's ability to provide unbiased recommendations to Lopez and, through Lopez, to the Family Court. As Lopez is an attorney, not a psychologist or therapist, and Lopez gave little or no weight to Dr. Moon and Dr. Breithaupt's opinion, Fisher's opinions played a critical role in this case.[34]

We conclude that, under the circumstances of this case, Mother was entitled to seek discovery from Fisher, subject to reasonable conditions and limitations, and to subpoena her testimony.

3. *The Limitations on Dr. Breithaupt's Testimony regarding Fisher's Conclusions*

Mother attempted to rebut evidence of Fisher's conclusions regarding Mother with testimony by Dr. Breithaupt. Objection was raised by Father that Dr. Breithaupt lacked foundation to testify regarding any conclusion about Mother which Fisher expressed in a letter that was admitted into evidence. The Family Court questioned Dr. Breithaupt about the extent of his knowledge of investi-

---

**34.** As Fisher's qualifications to testify and the reliability of her opinions on the matters before

the Family Court are not at issue on this appeal, we do not address them.

gations or records relied on by Fisher in forming her opinion. Dr. Breithaupt replied that he had not viewed any investigative report, notes, or other material that Fisher might have relied on, only the letter offered by Father. The Family Court concluded that Dr. Breithaupt had no foundation to offer an opinion on the conclusions reached by Fisher in her letter.

▮▮▮ Mother called the Family Court's attention to the fact that Mother's discovery request to Fisher had not been allowed and, therefore, no material was available for Dr. Breithaupt to review prior to trial. The Family Court ruled that allowing Dr. Breithaupt to testify about his opinion of the lack of foundation for Fisher's conclusions would not be "fair to either side." The Family Court has wide discretion to limit expert testimony. *See, e.g., State v. Wallace*, 80 Hawai'i 382, 419 n. 37, 910 P.2d 695, 732 n. 37 (1996) (whether expert testimony should be admitted at trial rests within the sound discretion of the trial court and will not be overturned unless there is a clear abuse of discretion); *Larsen v. State Sav. & Loan Ass'n*, 64 Haw. 302, 304, 640 P.2d 286, 288 (1982). We conclude that the Family Court did not abuse its discretion in limiting Dr. Breithaupt's testimony.[35]

### C. The Polygraph Evidence

Hawai'i law concerning the use of polygraph evidence is well-established and crystal clear. In 1962, the Hawai'i Supreme Court held that the results of polygraph tests are inadmissible for any purpose. *State v. Chang*, 46 Haw. 22, 31–38, 374 P.2d 5, 11–14 (1962); *see also State v. Reyes*, 93 Hawai'i 321, 326 n. 3, 2 P.3d 725, 730 n. 3 (App.2000) (citing to *Chang* for Hawai'i rule on the credibility of lie detector tests); *State v. Okumura*, 78 Hawai'i 383, 397, 894 P.2d 80, 94 (1995) (reaffirming *Chang* holding that

polygraph results are inadmissible);[36] *State v. Antone*, 62 Haw. 346, 357, 615 P.2d 101, 109 (1980) (citing *Chang* holding that polygraph results are inadmissible). In *Chang*, the supreme court plainly stated:

> Evidence of a lie detector test has no place in the trial of a case. Courts do not consider the polygraph or lie detector sufficiently perfected nor the interpretation of results in its use reliable enough to permit testimony respecting such a test to be admitted in evidence. No rule of evidence could be more firmly established than that excluding such testimony.

46 Haw. at 31, 374 P.2d at 11.

The rule of law disallowing the use of polygraph evidence also comports with Hawai'i Supreme Court precedent holding that expert testimony on a witness's credibility invades the province of the trier-of-fact to determine who is telling the truth. *State v. Batangan*, 71 Haw. 552, 556–57, 799 P.2d 48, 51 (1992); *State v. Klafta*, 73 Haw. 109, 117, 831 P.2d 512, 517 (1992). "A fundamental premise of our criminal trial system is that the jury is the lie detector." *United States v. Scheffer*, 523 U.S. 303, 313, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (plurality opinion). We see no reason to apply a different rule when the trier-of-fact is a judge.

The *Chang* opinion announced that lie detector tests are inadmissible whether offered by the prosecution or the defense, in civil cases as well as criminal, and that a person's "*willingness or unwillingness to take such a test is inadmissible at trial.*" *Chang*, 46 Haw. at 33–34, 374 P.2d at 12 (emphasis in the original) (citations omitted); *accord, e.g., United States v. Prince–Oyibo*, 320 F.3d 494, 501 (4th Cir.2003) (willingness to take test inadmissible); *Commonwealth v. Martinez*, 437 Mass. 84, 769 N.E.2d 273, 278–79 (2002) (willingness to take test inadmissible) *State*

---

35. The Family Court correctly limited Dr. Breithaupt's testimony regarding Fisher's conclusions as he lacked foundation to opine on what data and procedures she utilized in forming her conclusions regarding Mother. *See* Bowman, *Hawaii Rules of Evidence Manual*, § 702–1[3][A] (3rd Ed.2006). However, Dr. Breithaupt's inability to effectively respond to Fisher's conclusions exemplifies the disadvantage Mother suffered as a result of the Protective Order.

36. *Okumura* overruled *Chang* on a separate and unrelated point of law. *Okumura*, 78 Hawai'i at 408, 894 P.2d at 106 (holding that, contrary to *Chang*, refusal to give an accomplice witness instruction is not, in every case, an abuse of discretion).

*ex rel. Kemper v. Vincent,* 191 S.W.3d 45, 49 (Mo.2006) (en banc) (willingness to take test inadmissible); *State v. Hawkins,* 326 Md. 270, 275, 604 A.2d 489, 492 (1992) (willingness to take test inadmissible); *Loren B. v. Heather A.,* 13 A.D.3d 998, 788 N.Y.S.2d 215 (N.Y.App.Div.2004) (polygraph inadmissible in civil custody proceeding); *Posner v. Dallas County Child Welfare Unit of Texas Dept. of Human Services,* 784 S.W.2d 585 (Tex.App.1990) (polygraph tests inadmissible in termination of parental rights proceeding); *Miller v. Heaven,* 922 F.Supp. 495, 500–04 (D.Kan.1996) (excluding evidence of polygraph examinations in a civil case); *contra Henderson v. Henderson,* 93 N.M. 405, 407, 600 P.2d 1195, 1197 (1979) (allowing polygraph evidence in child custody matter). Although Hawaiʻi courts have recognized that polygraphs may be used as investigative, screening, or monitoring tools, they have never wavered from the rule announced in *Chang. See, e.g., Kahoʻohanohano,* 117 Hawaiʻi at 271–72, 178 P.3d at 547–48 (noting use of polygraph in DHS investigation); *State v. Naone,* 92 Hawaiʻi 289, 990 P.2d 1171 (1999) (allowing polygraph testing for investigative or monitoring purposes, including as condition of probation, but not for evidentiary purposes).

In the case now before us, the parties' willingness to submit to polygraph testing and the results of such testing both contributed substantially to the change of custody from Mother to Father. A significant portion of Father's Ex Parte Motion is based on unverified, third-hand reports of polygraph testing. In the motion itself, Father repeatedly hammered on the polygraph testing:

> ... Most recently, [Mother] has "failed" a polygraph test administered by the Maui Police Department on the issue of her allegations that [Father] has sexually molested [Child].

> Immediately after being informed that she had failed the polygraph test, [Mother] indicated to [Rezents] that she did not want [Father] to have visitation.

> A day after she failed the polygraph test, [Mother] filed for a temporary restraining order ...

Lopez's declaration in support of (and attached to) Father's Ex Parte Motion strongly suggests that Lopez changed her position on Child's custody based on the oral reports she received concerning the parties' polygraph tests:

p. At the conclusion of the meeting [with Lopez, Brewerton, Fisher, Rezents, Lindquist, Dr. Moon, and the director of the Children's Justice Center,] it was agreed that the contents of the videotape required further investigation. Detective Rezents was to present the matter to the Prosecutor's Office. Visits with Father were to be stopped, preferably with Father's acquiescence.

q. Ms. Brewerton informed Father of the outcome of the meeting and he agreed to stop his visitations until such time as there was still another, full investigation. Father offered to take another polygraph, his third thus far.

. . . .

t. Father had previously requested that Mother take a polygraph. Mother agreed and the order issued from the July 28, 2005 hearing, required [sic] Mother to take a polygraph to assist the GAL in her investigation. It is unknown to Declarant whether Mother took a polygraph pursuant to the court order. A written request was made to Mother's attorney for that information but there has been no response.

u. However, Detective Rezents requested that Mother take a polygraph, and Mother did so on September 19, 2005.

v. Detective Rezents informed Declarant that Mother's responses showed deception, and Mother was informed of the results. Mother reportedly asked Detective Rezents whether Father's visitation would recommence.

w. On September 20, 2005, the day after Mother failed the polygraph, she filed for and was granted a tempo-

rary restraining order against Father.

. . . .

5. I believe Mother has been coaching [Child] to say the things that [Child] has said for the sole purpose of terminating contact between Father and [Child].

. . . .

9. At this time I support a change in custody from Mother to Father as I believe such a change is in the child's best interests.

At trial, Lopez confirmed that the results of Mother's polygraph test caused her to change her opinion on custody in favor of Father: [37],[38]

Q (by [Father's counsel]) Were you made privy to the results of the polygraph.

A Yes.

[Objection by Mother's counsel]

. . . .

Q And then as a result, did your position with regard to who should have custody change?

A Yes, it did.

Father's declaration in support of Father's Ex Parte Motion is similarly infused with his willingness to take polygraph tests, his report that he "passed" two tests and volunteered for a third, and his lawyer's report to him (necessarily based on someone else's report to her) that Mother's test came up as deceptive.

■ Although she had no opportunity to object to the consideration of the polygraph "evidence" at the time of Father's Ex Parte Motion, Mother raised and preserved her objections at trial and on this appeal. In addition to the use of the polygraph tests in conjunction with Father's Ex Parte Motion, at trial, Father attempted to enter into evidence both polygraph test results and offers to take polygraph tests. Mother objected. The Family Court upheld Mother's objec-

tions as to the admissibility of polygraph results, but ruled that offers to take the polygraphs are admissible. The Family Court erred in allowing evidence regarding the parties' willingness to submit to polygraph testing. While the Family Court excluded direct testimony regarding polygraph results and specific references to the polygraph results in Lopez's GAL report, the Family Court gave "great weight" to Lopez's custody recommendation, which was admittedly formed in part based on the polygraph results. To the extent that the polygraph results contributed to the granting of the Ex Parte Order, they triggered Mother's prolonged separation from Child, substantially affected the outcome of the custody proceedings, and were highly prejudicial to Mother in ways that were not adequately addressed by merely excluding those results at trial.

D. *The Cumulative Effect of Errors on the Family Court's Conclusions as to Custody, Visitation and Relocation*

Mother argues, on additional grounds as well as based on the foregoing errors, that the Family Court clearly erred in its ultimate determinations regarding custody, visitation, and relocation. Our consideration of these contentions is grounded in HRS § 571–46 (2006), which stated in part:

**§ 571–46. Criteria and procedure in awarding custody and visitation.** In the actions for divorce, separation, annulment, separate maintenance, or any other proceeding where there is at issue a dispute as to the custody of a minor child, the court, during the pendency of the action, at the final hearing, or any time during the minority of the child, may make an order for the custody of the minor child as may seem necessary or proper. In awarding the custody, the court shall be guided by the following standards, considerations, and procedures:

---

**37.** From the time of her declaration in support of Father's Ex Parte Motion, Lopez's position never wavered, even when Mother hired independent experts who reported that the polygraph results relied on by Lopez were inconclusive and unreliable.

**38.** The first of Lopez's two GAL reports similarly includes references to offers to take polygraph tests, polygraph results, and Mother's failure to forward the result of a privately conducted polygraph test that Lopez "believes" Mother took.

(1) Custody should be awarded to either parent or to both parents according to the best interests of the child, *and the court may also consider frequent, continuing, and meaningful contact of each parent with the child unless the court finds that a parent is unable to act in the best interest of the child;* [39]

. . . .

(4) Whenever good cause appears therefor, the court may require an investigation and report concerning the care, welfare, and custody of any minor child of the parties. *When so directed by the court, investigators or professional personnel attached to or assisting the court shall make investigations and reports which shall be made available to all interested parties and counsel before hearing,* and the reports may be received in evidence if no objection is made and, if objection is made, may be received in evidence; provided the person or persons responsible for the report are available for cross-examination as to any matter that has been investigated;

(5) The court may hear the testimony of any person or expert, produced by any party or upon the court's own motion, whose skill, insight, knowledge, or experience is such that the person's or expert's testimony is relevant to a just and reasonable determination of what is for the best physical, mental, moral, and spiritual well-being of the child whose custody is at issue;

(6) Any custody award shall be subject to modification or change whenever the best interests of the child require or justify the modification or change and, wherever practicable, the same person who made the original order shall hear the motion or petition for modification of the prior award;

. . . .

(8) The *court may appoint a guardian ad litem to represent the interests of the child* and may assess the reasonable fees and expenses of the guardian ad litem as costs of the action, payable in whole or in part by either or both parties as the circumstances may justify[.]

(Emphasis added.)

 This court has previously held that "the family court is not authorized by statute or otherwise to delegate its decision-making authority to a guardian ad litem" and "when the family court orders that one parent 'shall have only supervised visitation with' a child, it must be as specific as is reasonably possible regarding the details such as the supervisor(s), the place(s), the day(s) and time(s)." *Bencomo v. Bencomo,* 112 Hawai'i 511, 516, 147 P.3d 67, 73 (App. 2006). In this case, the Family Court unquestionably violated these principles when it entered the Ex Parte Order based on Lopez's *beliefs* about whether Father was abusing Child or whether Mother was coaching Child, without a hearing at which the underpinnings for these beliefs could be addressed by Mother and duly considered by the Family Court. The Ex Parte Order, as the Final Order, further violated these principles with unreasonably vague provisions regarding supervised visitation. In the Ex Parte Order, the court provided only, "[Mother] shall have supervised or monitored visitation as arranged with [Lopez]." In the Final Order, the court ordered "[Mother] is hereby awarded rights of supervised visits in California as often as once per month, at her expense."

 This court is keenly aware that custody, visitation, and relocation decisions should be overturned only in the rarest of cases, where there has been a "manifest abuse of discretion." *See, e.g., Sabol v. Sabol,* 2 Haw.App. 24, 31, 624 P.2d 1378, 1383 (1981). The sole consideration in every custody case is necessarily the best interest of the child. However, a child's best interest can be justly and adequately determined only

**39.** This italicized part was added effective July 12, 2005. The statute was further amended in 2008.

in proceedings that are consistent with the requirements of the Hawai'i Constitution and applicable law; that did not happen in this case. Therefore, we must vacate the Ex Parte Order, the Order re Motion to Vacate to the extent that it denied relief as to the Ex Parte Order, the Final Order, and the Family Court's Findings of Fact and Conclusions of Law, and remand this case for further proceedings.

Pursuant to HRS § 571–54, we order that, upon remand, Child's custody shall be restored to the custody and visitation schedule set forth in the California Custody Judgment. However, in light of the circumstances of this case, the Family Court will need to exercise its sound discretion as to the timing and process for implementing this transition in accordance with the best interests of Child. It appears to this court that, under the circumstances of this case, Child's best interests require: (1) a *new* GAL be appointed to represent Child in this process; (2) in accordance with HRS § 571–46.5, a detailed parenting plan be developed by the parties or, if necessary, the court, and fully implemented for a reasonable period of time,

*prior* to either party's initiation of further motions to modify custody and visitation;[40] and (3) in accordance with HRS § 576D–7, a review and adjustment of the child support order set forth in the California Custody Judgment.

In light of the foregoing, we need not address Mother's remaining arguments and contentions of error.

## V. CONCLUSION

For the foregoing reasons, the Family Court's Final Order, Ex Parte Order, Order re Motion to Vacate (to the extent noted above), and June 19, 2007 Findings of Fact and Conclusions of Law are vacated and this case is remanded to the Family Court for further proceedings consistent with this opinion.

---

**40.** As provided in HRS § 571–46, the Family Court may, at any time during the minority of Child, make a further order for the custody of Child in accordance with the statute. We have fashioned the remedy on this appeal to address the significant errors that occurred in the proceedings below fully understanding that the restoration of primary custody to Mother will likely be disruptive in the first instance. This remedy does not, however, require the Family Court to turn a blind eye to further improper conduct by either party, or material changes in circumstances, that would warrant modifications in the best interest of the child, notwithstanding the remedial intent of this court's order.